(No. 32405.—

BEATRICE GLASSER *et al.*, Appellants, *vs.* ESSANESS THEATRES CORPORATION *et al.*, Appellees.

*Opinion filed January 22, 1953—Rehearing denied March 24, 1953.*

JOHNSTON, THOMPSON, RAYMOND & MAYER, and RO-
SENBERG, STEIN & ROSENBERG, both of Chicago, .(FLOYD
E. THOMPSON, SAMUEL W. BLOCK, EDWARD E. LYNN,
JOSEPH ROSENBERG, and AARON L. STEIN, of counsel,) for
appellants.

EDWARD BLACKMAN, and MICHAEL CONANT, both of
Chicago, (ODE L. RANKIN, of counsel,) for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This cause comes to this court as a result of our allow-
ance of a petition for leave to appeal from a judgment of
the Appellate Court, First Division, First District, affirm-
ing a final decree entered in the superior court of Cook
County, dismissing plaintiffs' action for want of equity.
In the intermediate tribunal, four different opinions were
written. The first, reversing the lower court, was written
by Justice Touhy, and concurring therein was Justice Fein-
berg, and rendering a dissenting opinion thereto was Justice
Niemeyer. Following that, this division of the Appellate
Court was reconstituted, and Justices Burke and Friend
were assigned to this division in place of Justices Feinberg
and Touhy. Thereafter, a petition for rehearing was
granted. The dissenting opinion of Justice Niemeyer be-
came the majority opinion, with Justice Burke concurring
and Justice Friend dissenting. Thus, the score at present
is one trial judge and two Appellate Justices have held the
plaintiffs' cause of action to be without merit and three
Appellate Justices have held the reverse.

In appellants' petition for leave to appeal much was said
about the impropriety of the action of the Appellate Court,
First Division as reconstituted, in giving consideration to
the petition for rehearing. However, appellants, in their
151 pages of briefs and arguments, have had nothing to
say about this alleged irregularity, so we will not burden

this opinion with its consideration but will proceed to discuss the merits of the cause.

Plaintiffs, Beatrice Glasser, Selma Melvoin, Bessie Altschuler, James Booth, and Ruth G. Booth are all members of a partnership, and, together with defendant counterclaimant, Minnie Stern, and defendant Velma Silverman, the remaining members of the partnership, are lessees of the Woods Theatre located at 50-56 West Randolph Street, Chicago. The defendants are Essaness Theatres Corporation, a Delaware corporation, which managed and operated the Woods Theatre for the partnership under a written management contract from November 3, 1943, to April 30, 1951; Woods Amusement Corporation, an Illinois corporation, and wholly owned subsidiary of the Essaness Theatres Corporation; Edwin Silverman, President and sole owner of Essaness; Edward Blackman, Vice-President of and attorney for Essaness; Velma Silverman, wife of Edwin Silverman and a member of the partnership, and Minnie Stern, another partner. It is claimed in the complaint that the defendant Essaness Theatres Corporation, as managing agent of the Woods Theatre to whom was entrusted the negotiation of a renewal lease to the premises on behalf of the Woods partnership, breached a fiduciary relationship claimed to exist between the parties when it purchased the reversion of the lease and fee. It is sought in this proceeding to impose a constructive trust upon the theatre property which is in the hands of the defaulting agent, to remove the agent as manager of the theatre, and to declare a forfeit of management fees.

The Essaness Theatres Corporation, the Woods Amusement Corporation, Edwin Silverman, Edward Blackman, and Velma Silverman answer jointly and assert that the interests of said partners in said partnership are as follows: Beatrice Glasser, 10 per cent; Selma Melvoin, 10 per cent; Bessie Altschuler, 10 per cent; James Booth, 2 per cent; Ruth G. Booth, 5½ per cent; defendant Velma Silverman,

37½ per cent; and defendant Minnie Stern, 25 per cent. The defendants, further answering, set up many matters in explanation of their alleged prodition and denied all charges of bad faith. After the complaint was filed, the defendant Minnie Stern admitted its allegations and filed a counterclaim, which is substantially the same as the complaint, and sought the same relief. Her position, therefore, is identical with that of the other plaintiffs, and we shall include her in this opinion under that designation.

This cause was tried by the chancellor for many days, and the record is voluminous. At the conclusion of the trial, the bill and counterclaim were each dismissed for want of equity.

To make a fair determination of this involved controversy, it is essential that we present a rather detailed history of the transactions that underlie this dispute, the property involved, the relationship of the parties, the interest of lessors and many other factors. The property in question is improved by a ten-story building which contains ground floor stores, offices, and the Woods Theatre. On July 31, 1942, the association of Franciscan Fathers of the State of Illinois, hereinafter referred to as Franciscans, purchased the fee and the lessors' interest in outstanding leases. On the following day, August 1, 1942, they leased the theatre portion of the building for fourteen months, expiring September 30, 1943, to the Woods Theatre Corporation, then owned by Sidney M. Spiegel, Jr., and Edwin Silverman. This lease was subsequently transferred to Spiegel and Velma Silverman, each having a one-half interest. They operated the theatre as a partnership. December 23, 1942, each sold a 12½ per cent interest in the lease and partnership to Emil Stern who transferred the interest thus acquired to his wife on December 31, 1942. On April 2, 1943, a lease from May 1, 1943, to April 30, 1946, was executed. Each of these leases gave the lessor an option to terminate the lease on sixty-days' written notice

should it require the premises for ecclesiastical purposes—a fact to be determined in its sole discretion.

The Essaness Corporation was organized in 1930 by Edwin Silverman, Sidney M. Spiegel, Jr., and Emil Stern. It was organized under the Delaware laws and its purpose was to operate theatres in Chicago and its environs. The first two named incorporators held 37½ per cent of the stock each, and the third, Mr. Stern, held 25 per cent. Since December, 1945, Mr. Silverman has owned all of the stock of this corporation. Mr. Spiegel died in 1944, and, thereafter, his executors and Mr. Stern sold their stock for $750,000 and $500,000, respectively. In April, 1938, Essaness negotiated with the Marshall Field estate, then owner of the property, for the acquisition of the Woods Theatre Building and Theatre, but, because of the indisposition of Emil Stern to make .the purchase, the negotiations culminated in a transaction in which Silverman and Spiegel purchased the Woods building under a 99-year lease. They took title thereto through 54 West Randolph Corporation, a corporation newly formed for this purpose in which Silverman and Spiegel invested $100,000. After the Woods building and theatre were brought under control of Silverman and Spiegel without participation by Stern, the Woods Theatre Corporation employed Essaness to manage the theatre for a fixed compensation. This gave Essaness a loop outlet which both Silverman and Spiegel desired it to have. In connection with the management of the Woods Theatre from 1938 to 1942, Essaness booked the pictures, prepared the advertising, hired and discharged employees, supervised the collection and deposit of the daily box office receipts of the theatre and caused the necessary disbursements of the theatre to be made.

In July, 1942, the Franciscan Fathers desiring to use the Woods property for their religious purposes procured the entire ownership of the property in fee and all interest therein by purchase of the fee and lessor's interest in the

ground lease from the Marshall Field estate. To accomplish this, 54 West Randolph Corporation assigned the lessee's interest in the 99-year lease and Woods Theatre Corporation assigned its theatre lease to the Marshall Field estate. On the day following, the Franciscan Fathers leased the theatre portion of said building to the Woods Theatre Corporation, then owned by Silverman and Spiegel for fourteen months expiring September 30, 1943, and Essaness continued its management of the theatre for Woods Theatre Corporation. On August 14, 1942, Silverman transferred to his wife, Velma Silverman, his fifty per cent of the stock of the Woods Theatre Corporation, and on September 1, 1942, the Woods Theatre Corporation assigned its lease of the Woods Theatre to Sidney Spiegel and Velma Silverman, each a one-half interest, who then through Essaness operated the theatre as a partnership until December 23, 1942. On December 23, 1942, Emil Stern purchased a 25-per cent interest in said partnership from the two partners for approximately $1500 and transferred it to his wife, Minnie Stern, on December 31, 1942. The Woods Theatre Corporation then had no further interest in the property and was subsequently dissolved.

On January 1, 1943, new articles of partnership were signed by Spiegel, Velma Silverman, and Minnie Stern and their interests were fixed at 37½ per cent, 37½ per cent, and 25 per cent, respectively, under the partnership name Woods Theatre, not incorporated.

On November 5, 1943, Sidney Spiegel sold his 37½ per cent interest in the partnership lease to the plaintiffs as follows: Beatrice Glasser, 10 per cent; Bessie Altschuler, 10 per cent; Selma Melvoin, 10 per cent; Ruth Booth, 5½ per cent; and James Booth, 2 per cent. Spiegel received from the plaintiffs therefor a note in the sum of $25,440 which was severally and jointly guaranteed by Maurice Glasser, Harry Altschuler, and Charles Melvoin, and contemporaneously, the plaintiffs received from Spiegel a

rebate agreement which provided the repayment of a part of the purchase price in the event the lease was cancelled by the Franciscan Fathers prior to April 30, 1946. The execution of such guarantee conclusively indicated that the partners recognized that their lease with Franciscan Fathers was of uncertain duration. Also on the same day, Essaness and the new partnership entered into a written management contract which provided that Essaness manage the Woods Theatre for the partnership for the following period: "Second parties (partners) hereby engage first parties (Essaness) to manage and supervise the operation of the Woods Theatre, for and on behalf of the second parties, from the date hereof, until April 30, 1946, or during the term of any extension of the Woods Theatre lease, on the terms and conditions hereinafter contained and first parties hereby accept such engagement for the period and on the terms herein contained." The lease was then extended to December 1, 1949, and again to April 30, 1951, without any change in its provisions or conditions.

Mr. Spiegel had charge of the negotiations for the renewal of the lease for the partnership and after his death in 1944 this function was performed by Emil Stern. There is no question but what the partnership was doing well operating the Woods Theatre. An income statement reveals the following:

Year ending August 31, 1941.....$ 23,013.08
Year ending August 31, 1942..... 67,265.59
Year ending December 31, 1943... 167,473.94
Year ending December 31, 1944... 280,869.54
Year ending December 31, 1945... 269,654.98
Year ending December 31, 1946... 289,197.61
Year ending December 31, 1947... 302,431.86
Year ending December 31, 1948... 232,831.51

It is significant, however, to note in passing that the whole enterprise stemmed from the activities of Silverman and Spiegel. It was they who conceived the idea, risked their

capital, laid the groundwork for this profitable venture. It was they who shared their interests with the present plaintiffs. During the early stages of negotiations that gave rise to this enterprise, Stern was unwilling to assume any risk.

It goes without saying that the partnership was interested in an indefinite continuation of their good returns and, looking into the future, were anxious for a renewal of their lease beyond April, 1951. It is the contention of the plaintiffs that Essaness was unfaithful to its trust in not honestly seeking the renewal of that lease but, on the contrary, stealthily and secretly purchasing the reversion which thus made it impossible for their lease to continue. Therefore, it is of major importance that we resolve this controlling issue—were the defendants dishonest and unfaithful in their undertaking to represent the plaintiffs with reference to the renewal of the Woods Theatre leasehold?

In our recital of events that transpired in connection with this inquiry, we must bear in mind that Emil Stern was a principal figure in the partnership; that after the death of Spiegel it was he who looked after all of the lease renewals; and that in the complaint filed herein it is alleged that Stern was the agent of the partnership in the matter of renewing the lease. On the opposite front is Edwin Silverman, the sole owner of Essaness and the one who is charged with double dealing. Thomas Nash, an officer of a real-estate corporation, acted on behalf of the Franciscans throughout all of the negotiations. Another whose name appears frequently is Edward Blackman, now a director and attorney for Essaness.

As we have heretofore noted, the plaintiffs were a partnership operating under the name of Woods Theatre, not incorporated. We have heretofore indicated the various interest of all the partners. The contract giving rise to the partnership which was entered into on November 5, 1943, provides that its business is the operation of the Woods

Theatre and that the differences as to management of the business or general partnership policy including the right to terminate the partnership shall be decided by the majority in interest. The partnership is for a term equal to the extension period of the Woods Theatre lease. The termination of said lease was to be the date of dissolution of the partnership except the right by majority decision to terminate it at an earlier time, and the partnership laws of Illinois were to furnish the rules of construction. The capital as fixed in the contract is $5000. The husbands of the five women partners generally assumed to represent their wives by appointment or consent in the negotiations over the lease. Glasser represented the group consisting of his wife, Beatrice Glasser, Selma Melvoin, and Bessie Altschuler, and James Booth and his wife. Emil Stern represented his wife, Minnie Stern, and Silverman represented Mrs. Silverman.

In the latter part of 1948, Stern undertook to discuss with Nash the possibility of an extension of the Woods Theatre lease beyond April, 1951, but was told by Nash that there was a new Provincial Father that had just been appointed, and that it would be useless to present any new business proposition to him until he had become familiar with his duties. Then in November, 1948, Stern left Chicago for an extended stay in California. Prior to leaving, he discussed the pending negotiations with Silverman and requested that in his absence Silverman, on behalf of the partnership, take over and follow up negotiations with Nash for a renewal lease. Stern returned in January, 1949, and remained about three weeks, after which he went back to California where he stayed until April 4, 1949. It is undisputed that pursuant to the commission to do so by Stern, Silverman on several occasions did see Nash, the accredited representative of the Franciscan Fathers, about the renewal of the lease. Silverman was informed by Nash that the new Provincial was not ready to act on matters of this

character. Then Silverman, on a subsequent visit to Nash's office, undertook to impress the importance of a renewal because the partnership was intending to expend a large sum of money on new chairs, decorations and carpeting, but would feel insecure in doing so unless they had assurances of a longer lease. Following this approach, Silverman received a letter from Nash, marked defendant's exhibit 45, dated January 1, 1949, which reads as follows:

"I am sorry I did not get a chance to call you before I left Chicago and to tell you of the meeting we had with the Fathers. The Provincial and the Treasurer, as well as other priests, attended this meeting and we went over in general the status of the Woods Building; but I am sure the time was not ripe to make any suggestions regarding a lease or the matter of the theatre seats.

"As you know the provincial has only just taken office and I am sure wants to familiarize himself with all of the workings of the building very thoroughly before making any changes. However, you can rest assured that at the right moment I shall do everything I can to promote the suggestions you have made.

"Dick Olson, my partner, is watching things while I am away from Chicago so that if there should be any changes I shall immediately fly to Chicago.

"With best regards to yourself and Emil Stern, I am
                    Very sincerely yours,
TN/g                              THOMAS NASH."

Silverman testified that on February 28, 1949, the Franciscan Fathers, through Nash, notified him for the first time that they would not renew the lease, and that immediately thereafter he conveyed this information to Stern. Silverman further testified that on March 16, 1949, he visited Stern in Palm Springs, California; that at that time he told Stern that there was positively no chance to secure an extension of the lease; that the Franciscans had decided to sell the property; and that at that moment there was a transaction pending for the sale of the property at a price of $1,700,000. On direct examination Stern testified that Silverman did not say anything to him about his effort to obtain an extension of the lease for the partner-

ship; that when he was in Chicago for approximately three weeks "he did not tell me anything about the Woods Theatre lease during those three weeks." On cross-examination then Stern was shown defendant's exhibit 45 which contained his initials in his own handwriting, and then he admitted that he had seen the letter and had discussed its contents with Silverman. Silverman testified that this interview occurred within five days of the receipt of exhibit 45.

Although the business of the partnership was admittedly lucrative and profitable, it was a known fact that its continuation might be interrupted any day. The lease provided that it could be terminated upon sixty-days' notice by the Franciscans. This property was purchased for church and monastery purposes. The war, with its attending high prices and labor shortages and building restrictions, delayed the conversion of the Woods Theatre into an ecclesiastical center. In 1948 and 1949 the Franciscan Fathers had definitely and positively made up their minds to immediately convert this property or sell it and with the proceeds purchase another.

Father Weir, Provincial of the Province of the Franciscan Fathers, Father Swoboda, Secretary of the Province and of Father Weir, and Father Thomas, who had, a month after the purchase of the Woods property in July, 1942, been put in charge of planning a church and friary on the premises, were called as witnesses by the defendants. They testified that the Order purchased the Woods property intending to convert it into a church and monastery; that they were prohibited by the rules of the Order from retaining income-producing property; that the Woods property was held until 1949 because they were not in a position, because of the war and other conditions, to convert it into a church; that by the end of 1944 they had completed plans for the conversion of the building; that under these plans all tenants would have been evicted and the entire

premises used for church purposes; that, in January and February, 1949, they instructed Nash of the real-estate corporation, Chicago representative, to sell the Woods property and procure a better location; that in 1949, they were not interested in any lease because they were determined to either convert the Woods property into a church or procure another place; that lease offers were made to them through Nash but that he was instructed to reject all of them; that they would not enter into a new lease or an extension of the lease or grant a lease to anybody. With respect to their intentions Father Weir testified, "No, we are not interested in any lease whatsoever because we were determined to either convert the Woods into a Church or purchase another place, but definitely." Father Swoboda said, "In January or February of 1949, the Order had concluded that if we would find the right kind of a deal we were decided to sell the Woods and buy a better location or to go ahead with the remodeling of the Woods." Father Thomas who was directly in charge of the conversion of the Woods Theatre, testified: "If we hadn't purchased the LaSalle Theatre Building, we certainly would have gone ahead with the remodeling of the Woods Building into a church and friary." The record further shows that the partnership was paying $60,000 a year rental, and that during this period Franciscan Fathers received a *bona fide* offer to lease for $100,000 a year with a deposit of $100,000. Father Innocent testified, "This was a very attractive offer, but it was rejected." As early as September, 1948, the consent of Cardinal Stritch was obtained, and the decision was made to dispose of the Woods property and look for a more suitable location. The expectancy of the renewal of its lease had vanished, and it is furthermore evident that there was not anything that Silverman did that caused it to disappear. It was the decision of the Franciscan Fathers to use the property in question for pur-

poses for which it was obtained, and not hold it any further in violation of the rules of the Order, that destroyed the expectancy of renewal.

Let us now consider the circumstances surrounding the acquisition of the property by the defendants. It is admitted by Silverman that in March, 1949, after he had learned that the Franciscan Fathers would not renew the lease but had definitely decided to sell or convert the property to their exclusive use, he became interested in the purchase of the property on behalf of Essaness. Stern testified that around April 21, 1949, Silverman told him he was trying to purchase the Woods building, that many others were interested in the purchase; that Silverman cautioned him against saying anything to anybody about his interest, including his wife. Plaintiffs lean heavily upon this latter statement as an admission of bad faith on the part of Silverman. Certainly, Silverman would not be so naive as to try to persuade Stern to betray his own wife. A more reasonable interpretation of the confidence reposed in Stern would be that Silverman did not care to have the fact broadcast that he was interested in the purchase of the Woods Theatre. Silverman had a talk with Father Terence about the purchase of the property and told Stern of this conversation. Silverman told Stern that Blackman had checked into the mortgage possibilities of the property, and Stern admits getting this information. In the evening of April 25, Silverman talked to Glasser and told Glasser that the property was being sold by the Franciscan Fathers, that he intended to bid for it, and agreed to meet him the next day. On April 26, 1949, Glasser and Stern were told by Silverman that the property was being sold; that the Franciscan Fathers had listened to an offer of $1,200,000; that the brokerage fees would be $50,000 payable over a period of five years at a rate of $10,000 per annum; and that the New England Mutual Insurance Company indicated that it would loan $750,000 toward the

purchase of the property provided Essaness would guarantee its payment. On April 27, 1949, Blackman told Glasser over the telephone that the Franciscan Fathers would not grant an option to purchase but would sell under contract on the terms heretofore outlined; that after a payment of $10,000 the balance was to be paid within six weeks after evidence of title to the property was shown to be good; that in the event the balance was not paid within six weeks after evidence of title was shown to be good, then the $10,000 would be forfeited and further liability would be terminated, which arrangement was the same as an option. Glasser and Stern had expressed an interest in an option, inasmuch as that would give them time to find someone to purchase the property that would lease to the partnership on favorable terms. In May, Emil Stern approached Henry Crown; later Morris Glasser saw George W. Borg and on May 18 they consulted Arthur Rubloff—all to no avail—but with the aid and acquiescence of Silverman. It was on April 25, 1949, that Silverman signed an application for the $750,000 loan. On April 26, Blackman sent to the Franciscans a form of contract of purchase by Essaness at the price of $1,200,000 of which $10,000 was earnest money to be paid concurrently with the execution of the agreement and the balance of $1,190,000 on delivery of the deed. If the purchaser defaulted, the earnest money was to be forfeited as liquidated damages. In addition Essaness was to pay a $50,000 commission in yearly installments of $10,000 each. The transaction was finally closed on the above terms through an escrow agreement dated June 30, 1949.

On May 19, Essaness gave each partner a copy of the letter of an opinion issued by the Chicago Title and Trust Company showing clear title to the Woods property, advising the parties that the six weeks' period within which the balance of the purchase price would be required to be paid would commence to run May 18, 1949. Many meetings

were called by Silverman and Blackman so that the members of the partnership and the Essaness representatives might sit down and work out some arrangement whereby the partners could participate in this deal. During these conferences the relationship between the plaintiffs and defendants became unfriendly and their meetings assumed a most legalistic air. Nobody would talk unless there was a court reporter to make a stenographic transcript of everything that was said. However, there were presented many proposal and counterproposals. It would require too much space to detail this phase of their disagreement. A careful analysis of the record on this subject reveals that the plaintiffs were making many unreasonable demands upon the defendants, that they wanted to participate in the deal if it did not entail a risk of their credit or capital.

On July 1, 1949, plaintiffs were advised of the closing and were given an additional ninety days to participate in this transaction. On July 21, 1949, plaintiffs were given copies of all documents which were executed in connection with the closing of the deal on June 30, 1949, including a detailed statement or account of the cost of the property.

The property was deeded to the Woods Amusement Corporation, a subsidiary of Essaness. Larger sums than the $1,200,000 were offered for the property, but they necessitated the Franciscan Fathers carrying a purchase mortgage which they did not want to do. The sum of $750,000 was borrowed from the New England Mutual Life Insurance Company. Essaness guaranteed the payment of this obligation, otherwise the loan would not have been made because various appraisals indicated that the Woods Theatre property was insufficient security.

The chancellor found that the defendants made repeated offers over a number of months for plaintiffs to contribute their pro rata share and join in the purchase of the Woods property but that all these offers were rejected. ·

In plaintiffs' brief it is strenuously argued that Silverman commenced his clandestine negotiations to obtain the property in question as early as June, 1946. This conclusion is predicated solely upon the testimony of Arthur Rubloff, president of Arthur Rubloff & Company, a real estate concern. The Appellate Court apparently subscribed to this charge in the two opinions reversing the lower court. Our study of the record leads us to the conclusion that the trial court, who heard and saw the witnesses, was correct in its finding that Silverman was completely honest in his dealings with the partnership.

A further justification of the trial court's determination with reference to Silverman's honesty is implicit in the following: Stern testified that Nash told him that Silverman was seeking to purchase the Woods Theatre property early in 1949. If this were true, it would be very damaging to Silverman's claim of fair dealing. Obviously, this purported evidence as presented is hearsay and clearly inadmissible. Also, coming from the lips of Stern, who had been slightly impeached, the testimony would be of dubious credibility. If it were a fact that Silverman had had such a talk with Nash early in 1949, Nash was the person to call upon to testify to such a fact. He was available to appear as a witness but the plaintiffs did not see fit to call him. On the contrary, the proof clearly indicated that Silverman, at the request of Stern, the acknowledged representative of the partnership, was doing his level best to secure an extension of the lease in question. Defendant's exhibit 45 corroborates Silverman's testimony that he was employing every known device to accomplish this assignment. He resorted to the plan of creating a supposed emergency—whether it was real or unreal is not known. Anyway, he told Nash that the partnership was interested in an extensive program of rehabilitation of the premises and of course the wisdom in doing so would not be indi-

cated unless they were assured an extension of their lease. Thus, he was going out of his way, beyond the call of duty, to faithfully carry out his assignment to procure an extension of the lease.

The trial of this cause required almost two weeks, the transcript of the testimony and exhibits contains almost 2000 pages and the written briefs and arguments submitted on behalf of the parties hereto total 373 pages. Of necessity we are compelled to omit many items of proof contained in the testimony and exhibits, but we consider that what has been said hereinbefore is a fair analysis of the facts pertaining to the principal issues in controversy.

The plaintiffs seek to impose a constructive trust upon the theatre in the hands of the defendants as defaulting agents. It is their theory that Essaness, as managing agent of the Woods Theatre and the negotiator of the leases to the premises on behalf of the Woods partnership, and in full control of those premises, breached the fiduciary relationship between the parties when it purchased the reversion of the lease and fee. It is their contention that the defendants failed to disclose negotiation for the purchase of the fee, which was antagonistic to the interest of the principals; that they availed themselves improperly of the opportunity to acquire the fee which rightfully belonged to the principals; that they refused to assign the option to purchase the premises to the principals without interposing a condition that they should be retained as the managing agency. It is the contention of the defendants herein that "the expectancy of renewal" of the lease in question was destroyed by the Franciscan Fathers themselves, and through no misconduct on the part of the defendants as agents for the plaintiffs; that they did not acquire any knowledge or confidential information while acting as managing agent for the partnership which they used to their own advantage; that they made full and complete disclosures of everything to the partnership and that the

plaintiffs were afforded an ample opportunity to participate in the purchase of the premises and that they refused to do so; that the partnership had neither capital nor the unanimous consent of its members, both of which would be necessary for the partnership to purchase the premises. It is the contention of the appellants herein that the Appellate Court in its ultimate opinion erred in decreeing first (a) that the partnership expectancy of renewal was terminated by the attitude of the Franciscan Fathers in 1949 when they did not extend the then existing lease, (b) that the agent, Essaness' Theatre Corporation, was free to acquire the reversion of the fee to Woods Theatre property for its own account, and (c) that the agent, Essaness, made full and complete disclosures to the partnership of its activities with respect to the lease negotiations and its activities with respect to the purchase possibilities of the property for its own account. We shall consider some of the cases relied upon by both parties. The case of *Crittenden & Cowler Co.* v. *Cowler,* 72 N.Y.S. 701, 66 App. Div. 95, is one that is given considerable attention by both sides and pertains to the refusal of a landlord to release the premises in question to a corporation which was in possession under an assignment of a lease. After refusal to renew the lease it was then leased to one of the directors of the corporation. The court in refusing to hold that the director held the lease in trust for the use of the corporation said: "Here there was no secret leasing, no act done 'behind the back.' Here we have a positive refusal on the part of the landlord to accept the corporation as a tenant. This refusal, after application made and considered, disposed of and cut off that 'expectancy' which is declared by some authorities to run with every lease—the expectancy of a renewal. * * * But the rule ceases to operate when such expectancy no longer exists. It will hardly be claimed that a landlord may not exercise his own discretion in the selection of a tenant. He may or may not renew, as he

chooses. When once he has declared against renewal, the tenant, then in occupation, has no more an expectancy which can be dealt with. Whoever thereafter leases does the tenant no injury, and takes from him no property or property rights. I see no reason in law or equity in excluding a copartner or a director in a corporation from dealing with the landlord in respect to the premises after a renewal to the occupying tenant has been refused by the landlord."

Another case relied upon by appellees is that of *Poy* v. *Allan*, 231 Mich. 472, wherein the landlord refused to lease to a tenant and thereafter leased to an agent of the tenant, and in denying relief to the tenant the court had the following to say: "The offer was rejected finally and absolutely and the rejection was in no way affected by fraud or collusion of defendants or any of them * * *. The promptness of Allan in applying for lease after his clients' offer had been rejected doubtless made them suspicious and gave color of merit to their claims. But the Boyntons had the undoubted right to refuse plaintiffs' offer. The reason for refusal need not be stated. But being refused finally, and such refusal being free from fraud or other infirmity, plaintiffs were not concerned in the lease subsequently made."

Another case is that of *Lipinski* v. *Lipinski*, 227 Minn. 511. The parties involved in that controversy were engaged in the wholesale fishing business, and in the conduct of that enterprise they had leased certain land on the shore of a lake. Adjoining this land was a small tract which was also used in the operations. A partner bought this tract with his own funds and took title to it in his own name. The court found that the parties stood in a relation of fiduciary to each other but denied plaintiff's claim that the tract was held in trust for the partnership or joint enterprise. In respect to the agreement of the parties the court stated: "We can find nothing in this agreement to indicate that the acquisition of additional real estate was one of

the objects or purposes of the business. * * * The undertaking involved was definitely that of a fishing enterprise and not one involving the acquisition, improvement, or development of real estate. It was limited to four years, and there was no provision for any renewal." The court also said: "Consequently, it has been held that, while a lease held by a partnership and the right to renew it are partnership assets, the title of a landlord is not so adverse to that of his tenant as to prevent a partner from purchasing the fee to the premises which the partnership leased, provided he practices no fraud or deception upon his copartners and holds his fee subject to the lease for the duration thereof. *Thanos* v. *Thanos*, 313 Ill. 499, 145 N.E. 250; *Sonek* v. *Hill B. & L. Assn.* 138 N.J. Eq. 108, 52 Atl. (2d) 852; *Anderson* v. *Lemon*, 8 N.Y. 236, affirming 4 N.Y. Sup. Ct. (Sandf.) 552."

In answer to these cases the appellants cite *Meinhard* v. *Salmon*, 249 N.Y. 458. In 1902 Salmon and Meinhard, as coadventurers, leased for a twenty-year term the property at Fifth Avenue and Forty-second Street in New York where the Bristol Hotel was located. Sometime before 1922 a Mr. Gerry, who already owned the adjoining lot on Fifth Avenue and four lots on Forty-second street, became the owner of the reversion to the property. Gerry desired to lease all the lots as one parcel or property. In 1921 he negotiated with various persons and corporations seeking to obtain a desirable tenant who would put up a building to cover the entire tract. These negotiations lasted for some months but failed. About January 1, 1922, Gerry's agent approached Salmon and began to negotiate with him for the lease of the entire tract. He would not consent to the renewal of the Bristol lease alone. This resulted in a lease to the Midpoint Realty Company, a corporation entirely owned and controlled by Salmon. Instead of an annual rent of $55,000, it was to be $350,000 to $475,000. Instead of a lease for twenty years, it was to be, at the

lessee's option, eighty years. The lease between Gerry and the Midpoint Realty Company was signed on January 25, 1922. Meinhard brought an action for a constructive trust. The court of appeals of New York, in passing upon the fiduciary relationship between copartners, through Justice Cardozo said: "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt* v. *Fischer*, 243 N.Y. 439, 444, 154 N.E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

The appellees then bring to our attention the case of *Palmer* v. *Taylor*, 235 N.Y. 367, 139 N.E. 478 (1923), in which Justice Cordozo concurred. Therein it was held that a trustee of a lease under a will, acting in good faith, might purchase a fee reversion of the leased property and resell it at a profit without liability to its beneficiary. It might be observed that the facts involved therein in some respects are somewhat analogous to those of the case under consideration, namely, that there was a full disclosure made to all of the beneficiaries who were themselves without funds to undertake to purchase the real estate. The court said: "In this transaction Taylor 'was undertaking to engage with his own funds and credit in a speculation in real estate, believing the property was on the market and

that Minnie and Elizabeth Palmer lacked funds to carry it.' The purchase was not in conflict with his duties as executor and trustee of the will of Mary J. Palmer and he acted innocently and with no intent to defraud the plaintiffs. * * * He was not dealing with the trust estate or any estate in which the Palmers had an interest, present or remote. He dealt simply with a reversion of property upon which he held a lease which ultimately might come to them, openly and with their knowledge and tacit approval. The judgment against him, therefore, in view of the findings actually made may not be sustained." Six years after the decision in *Meinhard* v. *Salmon,* Judge Learned Hand in *Prudential Ins. Co.* v. *Liberdar Holding Corp.* 72 Fed. 2d 395 (C.C.A. 2, 1934) cited the case of *Palmer* v. *Taylor* with approval as the law of New York.

There is an early case in Illinois, *Fairman* v. *Bavin,* 29 Ill. 75, where a confidential clerk obtained a lease for a building in which the employer conducted his business, and a suit was brought for a decree that the clerk held the lease for the employer. It appeared that the tenant had refused to take a further lease on the premises and after such definite refusal the clerk rented the premises. The court denying relief said: "While we are disposed to go to the extremest length to hold agents, or those occupying fiduciary capacities, to the strictest fairness and integrity toward their principals, and to prevent them from taking advantage of their position to benefit themselves at the expense or disadvantage of their principals; yet we find nothing in this case violative of this principle. The defendant was not employed in any way to procure or assist in procuring this lease, and seems carefully to have abstained from negotiating for it, till the plaintiff had finally refused to take it. As between her and the landlord, the negotiation was ended, and neither the landlord nor the defendant had any reason to suppose that she [plaintiff] still desired to procure these premises. The defendant had every reason

to suppose she contemplated procuring another place for the conduct of her business."

Throughout the briefs of appellees we find that there is heavy reliance placed upon the case of *Davis* v. *Hamlin,* 108 Ill. 39. Let us consider this case rather closely and determine its applicability to the present situation. Hamlin was the lessee of the Grand Opera House in the city of Chicago, under a lease which was about to expire, and Davis was the manager of the theatre for Hamlin. During the course of his employment, Davis learned of the expiration of the lease, the value of the property for the purpose for which it was used and that Hamlin was seeking a renewal of the lease, and of the value of the theatre to Hamlin and the amount of increased rental Hamlin was willing to pay to retain the leasehold. Without the knowledge of Hamlin, Davis proceeded to obtain a lease for himself, to begin at the expiration of the Hamlin lease. Davis offered the landlord $5000 in excess of the rental which Hamlin was then paying. Not unlike the present case, Hamlin filed a bill to declare a trust in said lease. Davis, in answering the charge of wrongdoings, stated that the obtaining of a renewal of a lease was not within the scope of his duty, he being merely the manager of the theatre and charged only with the specific duty of engaging amusements and settling with the various show companies. It was held therein that, in the employment of an agent, the principal bargains for a disinterested skill, diligence and zeal of the agent for his own exclusive benefit. Upon entering into the employ of Hamlin there rested upon Davis the duty of fidelity to his employer's interest, the furtherance and advancement of his business, and not its injury. It was further observed that Davis's first offer to rent the premises from Borden was an act hostile to the interest of his employer. It was apparent therein that Davis used stealth, secrecy and duplicity undermining his employer. When Hamlin specifically asked Davis about his activity in this matter, he did not

tell him the truth. The court further had this to say, at page 48: "Although there was here no right of renewal of the lease in the tenant, he had a reasonable expectation of its renewal, which courts of equity have recognized as an interest of value, secretly to interfere with which, and disappoint, by an agent in the management of the lessee's business, we regard as inconsistent with the fidelity which the agent owes to the business of his principal." We do not consider this case as determinative of the problem before us. We do not find in the conduct of Silverman the duplicity, faithlessness, and treachery exhibited by Davis. Another important distinction lies in the fact that in the instant case there was no expectancy of renewal. As we have heretofore pointed out, this had been completely destroyed before Silverman commenced his negotiations for the fee.

This court is in entire accord with the principles announced in the various jurisdictions and by this court holding that the conduct of fiduciaries must be held to a high level; that it is their fundamental duty to maintain complete unselfishness and inflexible loyalty; and that to deviate from those high standards would open the way to fraud and wrong. In the *Meinhard case* the defendant secretly negotiated with the landlord for a new lease before the expectancy of renewal of the existing lease had been extinguished. This vice is not present in the instant case. The evidence is overwhelming and without contradiction that the Franciscan Fathers would not renew the lease in question but were determined with finality to either convert the property into a church or sell it for cash and buy a more suitable site. Neither Silverman nor any of the defendants had anything to do with this decision. To hold the property longer for other than church purposes was a distinct violation of the rules of the Order. Although the plaintiffs were fully advised of this step about to be taken by the Franciscan Fathers, they did nothing about it. The trial

court and the Appellate Court found that the defendants acted in good faith throughout.

It is also contended by appellees that Essaness was not competing against the partnership in the purchase of the Woods property. It appears in the evidence that one of the partners, Minnie Stern, had unqualifiedly declined to participate in the purchase of this real estate. The purchase of a million-dollar item was beyond the scope of the partnership agreement and would have been in violation of one of its salient articles which provided that such a venture must have the unanimous consent of all parties. In other words, defendants contend that partners in a $5000 capitalization cannot legally be forced to join in $1,200,000 enterprise. Doubtless this argument has validity but is no answer to the contention of the plaintiffs that the defendants, in violation of a position of trust, destroyed their lucrative leasehold by purchase of the fee. Under the circumstances of this case, we are of the opinion that the conclusions reached by the trial court and Appellate Court on fact and law should be affirmed. No case is cited by appellants wherein the conduct of a fiduciary has been condemned and relief granted where the facts are comparable to those presented in this record. Edwin Silverman was not an agent for the partnership in the ordinary sense. Silverman was the entrepreneur who started this profitable business. The origin, management and success of the plaintiffs' partnership is traceable to his ingenuity and enterprise. Silverman's wife owned the largest single share in the partnership—37½ per cent—the remaining interests were divided between six others. It is incredible to believe that Silverman would embark upon a scheme to betray such a group of business associates, one of whom was his own wife. The leasehold in controversy was of uncertain duration, its expectancy of renewal was gone. It was only after full disclosures were made to the partnership that Essaness purchased the fee, and thereafter every

reasonable opportunity was given the partners to participate in the purchase, but this they rejected.

It is our opinion that the determinations of the trial court and the ultimate opinion of the Appellate Court should be and they are affirmed.  *Judgment affirmed.*