Robert A. Cooper, William M. Thompson, E. Elizabeth Carr and Newspaper Features Syndicate, Inc., Appellants, v. National Newspaper Syndicate, Appellee.

Gen. No. 46,410.

Opinion filed July 2, 1954. Rehearing denied July 26, 1954. Released for publication July 26, 1954.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, of Chicago, for appellants; JOHN B. MARTINEAU, and DON H. REUBEN, both of Chicago, of counsel.

ALBERT E. JENNER, JR., and CHARLES J. O'LAUGHLIN, both of Chicago, for appellees; JOHNSTON, THOMPSON, RAYMOND & MAYER, of Chicago, of counsel.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

Robert A. Cooper, William M. Thompson and E. Elizabeth Carr, former employees of plaintiff (National Newspaper Syndicate), and Newspaper Features Syndicate, Inc., formed by defendants after severing their connections with plaintiff [hereinafter called defendants], appeal from an order denying their motion to dissolve a temporary injunction, issued on the filing of the complaint, restraining them from competing with plaintiff in marketing and distributing to newspapers a daily cartoon strip called "The Girls," the creation and property of Franklin Folger, a defendant not a party to this appeal, and another newspaper feature, "Your War Problems," the property of William Bishop, not a party to this litigation.

The injunction was issued on the verified complaint. Within a week the defendants now appealing filed their sworn answer, joining issue on material allegations of the complaint, and moved to dissolve the injunction. A hearing was had in which all the defendants, Folger and the managing officers of plaintiff testified at length. The controlling question presented is the right of Cooper, a former employee of plaintiff, to syndicate—market and distribute—The Girls after Folger withdrew the cartoon from plaintiff, who had been syndicating it under a verbal arrangement terminable at will. The right of the defendants to syndicate Your

War Problems is independent of their rights to syndicate The Girls. It is of considerably less importance to the parties and will be treated separately and after disposition of the primary questions raised in respect to The Girls.

The plaintiff is managed and directed by John Flint Dille (hereinafter called Dille), president, and his son Robert A. (hereinafter called Bob), secretary and manager. Cooper, the principal defendant, had been a salesman for plaintiff for approximately 25 years. When he terminated his employment he was working under a written contract dated June 27, 1949, whereby he was to represent plaintiff "in calling upon newspapers throughout the United States" for three years and from "year to year for an additional period of three years" at the option of plaintiff. There was no contract between the parties requiring Cooper to seek, discover or solicit new features for syndication by plaintiff. At times throughout his employment Cooper had reported to plaintiff for syndication cartoons, comic strips and other newspaper features, and had received commissions, called a finder's fee, fixed by plaintiff, on those accepted and syndicated by plaintiff. Defendants Thompson and Carr were employees of plaintiff, in office positions for approximately three and a half years.

Folger, a free lance cartoonist operating in Cincinnati, Ohio, submitted The Girls to plaintiff for syndication in the fall of 1951. Dille rejected it. In January 1953 Cooper was introduced to Folger in Cincinnati by Mr. L. D. Warren, editorial cartoonist for the Cincinnati Enquirer and also under contract to plaintiff. Cooper was given photostatic samples of Folger's cartoons. He showed them to newspapers on his eastern trip for plaintiff. On his return to the office he submitted The Girls to plaintiff, with very favorable recommendations. Dille did not immediately accept the

cartoon. Folger was negotiating with other syndicates. Cooper persuaded him to withhold action, assuring him that plaintiff would give him as favorable a contract as any other syndicate would offer. In the summer the cartoon was accepted and was first published under plaintiff's syndication September 28, 1953. At the time of the hearing on the motion to dissolve the injunction it was being published in 38 or 42 newspapers. Cooper had sold it to 16 papers.

Folger wanted a written contract embodying the terms of his talks with Dille and Cooper, the basis of which was the payment to Folger of 50 per cent of the gross sales of the cartoon, less mechanical expenses— the terms of a standard newspaper feature contract. In late September Dille submitted a written contract to Folger. It provided for the payment to him of 50 per cent of the gross sales proceeds after first deducting therefrom the mechanical and base sales expenses of producing and selling the cartoon. Mechanical expenses were defined as including, particularly, but not consisting exclusively of engraving, matrices, proofs and printing. Base sales expenses were defined as the income of each new order from newspapers for the feature for the first five weeks of the order. Folger discussed the contract with an attorney in Cincinnati and an attorney in New York. He also talked with Dille on the phone, and with Cooper in Cincinnati and in New York, and showed Cooper a letter from another syndicate and was assured by Cooper that plaintiff would meet his, Folger's objections. Folger objected principally to the deduction of the first five weeks' income on each order from a newspaper, to the limitations on his activities as a free lance artist, to the right of plaintiff to renew the agreement for an additional period of five years upon written notice mailed on or before September 15, 1958, and the giving to plaintiff of the sole agency for selling or licensing by-products of the

feature. Dille testified that in October he talked with Cooper about the Folger contract and was told by Cooper that he, Dille, would get the contract after the first of the year and that Folger would not sign a contract before that time; that in the early part of December he, Dille, talked with Folger on the phone and was told by Folger that he was holding up the contract because he was going to New York to see Kennedy & Company, sellers of secondary rights for various books, strips, and so on; that Folger told him in the latter part of December that the Kennedy matter had not been resolved; that he, Dille, also talked with Cooper in the latter part of December when the latter said that Folger's contract was not part of his business and that Dille or the office should sign the contract with Folger. A new contract, in duplicate, dated December 1953 and signed by Dille, was first submitted to Folger for his signature by Bob Dille at Cincinnati on January 8th, 1954.

In the meantime Cooper's relations with Dille were deteriorating. In June 1953 Cooper told Dille that he wanted to discuss a readjustment of his contract. Dille replied that he was going to California and suggested that the matter remain in abeyance until his return. However, Cooper's traveling allowance was increased from $16 a day to $22. An efficiency expert had been brought into the business. He recommended a division of the selling territory into four equal productive areas. The proposed rearrangement would take from Cooper some of the larger towns which he had had for years and require him to make smaller towns which he had not made for years. He positively refused to consent to any rearrangement of his selling territory, and Dille then stated that nothing would be done at that time. Cooper testified that no change was later made in his territory, and so far as he knew the proposed plan was not in any degree adopted. On January 6,

1954 Cooper was given a statement of his account showing his sales commissions and his finder's fees, including a finder's fee on The Girls for the months of November and December. In a discussion with Dille he stated that he felt that he should resign. Dille replied that it would be unfortunate but that he knew no way to prevent it. They agreed to discuss the matter two days later, Friday afternoon, January 8th. The next day Cooper told Dille that he, Cooper, was not bluffing about his resignation. At that time Folger was preparing a Sunday page of The Girls. He had discussed it with Cooper and Cooper in turn had discussed it with Dille, although the latter says not until January 6th or 7th. Dille testifies that that night he sent Bob to Cincinnati to give Folger the benefit of Dille's ideas in regard to the Sunday page, as Folger had never previously prepared one. Bob also took with him the December 1953 revision of the proposed contract with Folger. Bob testified that he knew nothing of Cooper's contemplated resignation until informed by Folger and Warren about 6 p. m. Friday that Cooper had resigned. Folger testified that the Sunday page was discussed only incidentally and that the principal subjects of his conversations with Bob on January 8th and 9th at Cincinnati related to the December 1953 contract.

On the afternoon of January 8th Cooper and Dille had their talk. They differ as to the details of the conversation. It is apparent, however, from the entire record that at that time Cooper resigned. He testified without contradiction that he said he was definitely through. On the following Monday, January 11th, at a conference between Bob, Cooper and W. Scott McDowell, Cooper's attorney, a letter addressed to plaintiff, attention of Dille, president, dated January 9th and signed by Cooper, was delivered to Bob. This letter stated in part: "This will confirm my decision expressed verbally to you on Friday, January 8, 1954, to

135

terminate my service to National Newspaper Syndicate effective as of January 8, 1954." Cooper rendered no services to plaintiff after January 8th. On January 19th he and his attorney had a conference with the attorney for plaintiff, at which a resumption of Cooper's former relations with plaintiff were discussed and a written statement of conditions on which Cooper would be willing to return to plaintiff was submitted. Nothing resulted from this conference. In the meantime Bob Dille requested and obtained Cooper's keys to the office and suggested that he not return to the office as his presence there was objectionable to Dille. By letter dated February 12, 1954 Dille acknowledged Cooper's letter of January 9, 1954, refused to accept his resignation and demanded that he promptly resume full performance of his duties under his contract.

 The contract of December 1953 had eliminated some but not all of Folger's objections. The contract was discussed at length between Folger and Bob in Cincinnati. Folger says that it was modified in accordance with what each believed to be fair. Folger nevertheless insisted in these conversations, and later, that he would not sign any contract unless it was submitted to Cooper and Cooper approved the terms and told him to sign. Dille, being advised of this fact, requested Cooper at the conference of January 8th to approve the contract, and Cooper refused. On Saturday night, January 9th, Bob, in Folger's presence in a Cincinnati hotel, called Cooper at his home in Dundee, Illinois and asked Cooper to advise Folger to sign the contract. Cooper refused, but did at Bob's request talk with Folger on the phone. Bob heard Folger's end of this talk. The conversation between Cooper and Folger was excluded on defendant's objection. The conversation having been had at Bob's request and he hearing Folger's part of the conversation, we think the conversation was competent, material and relevant. At the time

of this conversation Cooper was giving a cocktail party in celebration of his resignation, the guests being a number of employees of plaintiff, including defendants Thompson and Carr, Maitland and Dunne [salesmen], Cooper's attorney, a lifelong friend, and one or two other friends.

In response to a request from Dille, Folger came to Chicago to discuss the contract with plaintiff and a continuation of the syndication of The Girls by plaintiff. Folger again repeated that he would not sign a contract unless approved by Cooper. In response to Dille's question "What is the peculiar fascination of Mr. Cooper for you?" Folger replied, "Well, Mr. Cooper sort of guided me into the syndicating business and he has done very well as a salesman." In further negotiations Folger suggested that even though Cooper did not resume his relations with plaintiff, Folger felt that Cooper should receive out of Folger's share 5 per cent of the net proceeds from The Girls, and that plaintiff should give him a like share. Dille testified that he offered to make this contribution in order to get the matter out of the way. Nothing resulted from this proposal. In early February, Dille again asked Folger to come to Chicago, where further discussions were had in respect to Cooper's future with plaintiff and the syndication of The Girls. Finally, at a meeting in a restaurant, Dille, Bob and another son, Jack, demanded of Folger to state whether he was going with plaintiff or leaving it, whereupon Folger stated that he no longer cared to be associated with their organization. Folger returned to Cincinnati and shortly thereafter received a telephone call from Bob asking that Folger wire immediately as to whether or not he was planning to continue permitting plaintiff to handle his feature and whether he would supply them with art work. Shortly thereafter, on February 23, 1954, Folger wrote to Dille, as president of plaintiff, notifying him that

137

"after due consideration and careful deliberation on my part, effective March 13, 1954, I am severing all future connections with the National Newspaper Syndicate." Folger further stated that his action was taken because plaintiff had resorted to threats against his future livelihood as a cartoonist, to destroy the cartoon feature The Girls, and other action to "intimidate me into signing a contract with the National Newspaper Syndicate." After writing this letter Folger wired defendants to take on his feature, and within a day or two submitted panels to them. He testified without contradiction that he decided on his own hook not to deal with plaintiff; that none of the defendants had ever told him they did not want him to contract with plaintiff or that they would like to have him enter into a contract with them; that he has no contract, either oral or written, with any of the defendants.

Thompson and Carr resigned as employees of plaintiff on February 12, 1954. Four days later Cooper, Thompson and Carr caused the defendant Newspaper Features Syndicate, Inc., to be incorporated, empowered to syndicate, distribute and sell cartoons, comic strips, newspaper columns, and other feature material for publication in newspapers throughout the United States—a business in direct competition with plaintiff. Cooper testified that he thinks he first decided to form his present syndicate the latter part of January; he asked Mr. McDowell to form a corporation around the first of February.

Plaintiff's application for an injunction was based on the allegation in the complaint that from the inception of Cooper's employment and at all times material to the matters in controversy it had been "his express duty to report to plaintiff any unsyndicated feature discovered by him to afford plaintiff the opportunity to syndicate such features," and that plaintiff agreed to pay him a commission for the discovery of such feature

138

if syndicated by it. This allegation is followed by the conclusion that by reason of the alleged duty to report unsyndicated features, and the fact that during his employment Cooper had reported to plaintiff at least six features which plaintiff had syndicated and distributed and for which it had compensated Cooper, it became his duty not only to report to plaintiff all features which came to his attention to afford plaintiff the opportunity to syndicate such features, but to assist plaintiff therein. Defendants contend that Cooper's written contract imposed no duty on him to secure new features and that he had never been told he must secure new features. On appeal plaintiff's counsel say that these contentions of defendants "are beside the point. Whether Cooper acted voluntarily or in response to plaintiff's offer (order) is immaterial. In either event he was plaintiff's agent to negotiate a contract with Folger and had the duties of such agent."

There is nothing in the contract of June 27, 1949, or in the conduct of the parties, obligating Cooper to report new features for syndication. By the written contract Cooper obligated himself only to represent plaintiff "in calling upon newspapers throughout the United States." These calls were to be made to sell to the newspapers the right to publish features syndicated by plaintiff. The features reported to plaintiff by Cooper were reported without direction or request from plaintiff. The duties of the parties after a feature was reported were never defined by contract, written or verbal. Cooper testified without contradiction that he had never been asked, prior to the demand made upon him in respect to the Folger contract, to negotiate or close a contract with any cartoonist, artist or feature writer whose work was to be syndicated by plaintiff. The alleged duty to report new features to plaintiff in order to afford to plaintiff the opportunity of syndicating such features, does not imply an obliga-

139

tion on the reporter to assist in the negotiation of the agreement to syndicate. The parties have not in the course of 25 years given a practical construction of their understanding as to their respective duties when a new feature was reported which justifies a conclusion that it was the duty of the reporter to participate in the negotiation of a contract with the artist. In refusing to comply with Dille's request of January 8 to "instruct Folger to sign the contract," Cooper told Dille "that wasn't my business whether Folger signed a contract, that I had brought Mr. Folger and the Dilles together and it was up to Mr. Folger to sign a contract; I couldn't persuade him one way or the other."

After Cooper had reported The Girls to plaintiff and it had entered into negotiations with Folger for the syndication of the feature, Cooper could not acquire rights in the cartoon antagonistic to plaintiff. This is so even though, as we hold, Cooper was under no duty to assist in negotiating the contract. He stood in the same relation to plaintiff as did Davis to Hamlin in the case of *Davis v. Hamlin*, 108 Ill. 39. In that case Davis was employed for the limited purpose of engaging amusements for the theatre conducted by Hamlin in leased premises. He was not charged with any duty to obtain renewal of Hamlin's lease. He secretly obtained a lease to the premises, commencing on the expiration of Hamlin's lease. Equity would not permit Davis to profit by the transaction. The interest acquired by him inured to Hamlin, Davis holding the lease as trustee. Cooper, however, would be free to contract with Folger after negotiations between plaintiff and Folger had been terminated by the uninfluenced independent action of Folger. *Glasser v. Essaness Theatres Corp.*, 414 Ill. 180.

Plaintiff contends that Cooper violated his duty to it by falsely stating that the Dilles were not interested in the cartoon; by failing to explain to Folger the pur-

140

pose of withholding from the artist, as sales expense, the gross return from new sales to papers of small circulation for the first five weeks; by failing to disclose his activities in connection with the Sunday page being worked out by Folger, and by refusing, on January 8th and 9th, 1954, to complete negotiations with Folger.

In April 1953, in a talk in Cincinnati, Cooper told Folger he had not been able to interest the Dilles in the cartoon at that time. He further testified that in May 1953, after a trip to the east, he told the Dilles that he considered The Girls a very good feature, but they said they thought they had too many features to handle at that time and were not particularly interested in taking on a new one. Cooper's statement as to this conversation is not contradicted. May 18, 1953 Dille wrote Folger that he considered The Girls very amusing and that it should sell to newspapers in the larger cities, "although I think it might be difficult to sell in smaller towns because they are pretty sophisticated"; that he would talk to Cooper on his return from a sales trip. On May 28th Dille wrote Folger that Cooper reports a very definite interest in The Girls. At the meeting in Cincinnati in April, Folger showed a letter from the Adams syndicate stating terms for the syndication of The Girls. Cooper then advised Folger that plaintiff would take his cartoon and make as attractive an offer as Adams had made; that plaintiff had a better sales force, having three salesmen to the one employed by Adams. Cooper asked that further material be sent him at an Editors' Convention in Washington, D. C. On receiving this material he showed it to the representatives of several newspapers, submitting it to one in the presence of Bob. On a later trip Cooper sold the cartoon to six newspapers. With this evidence of the salability of the cartoon, plaintiff and Folger entered into an oral agreement in June for the syndication of

the cartoon on a basis of 50 per cent of the gross sales of the cartoon, less mechanical expense to Folger—the terms of a standard newspaper feature contract.

The Dilles and Cooper testify that some of the artists (including cartoonists and feature writers) for whom plaintiff was syndicating their work, did not have written contracts. Folger asked for a written contract and in September complained that he had not received one. Cooper explained that plaintiff was slow in sending out the contracts. On September 23rd Dille sent Folger a written contract containing a provision authorizing the deduction from the gross sales proceeds of a sales expense, consisting of the income for the cartoon on each new order for the first five weeks. Folger objected to this deduction. Dille says that he told Folger that he would waive it. He further testified that in September he asked Cooper to explain to Folger the reason for the withholding for five weeks of Folger's share on small orders from papers of less than 10,000 circulation. No revised contract was submitted to Folger until January 8, 1954, when Bob was in Cincinnati. That contract contained a provision for the deduction of the income received from orders from newspapers with a circulation of less than 10,000 for the first five weeks of the contract. On the hearing Dille explained this provision by stating that the charge made to newspapers varied, it being based partly on the circulation of the newspaper; that because of the low price charged, the salesmen were not interested in soliciting papers with small circulation, and it was suggested that as an inducement to the salesmen, both plaintiff and the artist allow the salesmen the income received from the paper during the first five weeks. There is no evidence tending to explain why the deduction of income for the first five weeks on new orders received from all newspapers, provided for in the September contract, was to be made. It is apparent from the agreements prepared

under the direction of Dille that he could not in September 1953 have discussed with Cooper the deduction of five weeks' income from orders from newspapers of small circulation. Furthermore, Dille testified, when speaking of the deduction of income from papers of small circulation, that plaintiff had only one contract in which that provision had been inserted, but that the contract had never been enforced and no deductions had been made from the artist's compensation. There is no evidence that the provision for the deduction of the income received from all papers, appearing in the September contract to be executed by Folger, had ever been inserted in any prior agreement.

█ In December 1953, on Cooper's trip to Cincinnati, Folger submitted to him specimens of a Sunday page of The Girls upon which he was working. Cooper took this material with him on his trip, submitting it to a number of newspapers which he named in his testimony. He further testified that the submission of this material was on behalf of plaintiff; that on his return to Chicago he discussed the Sunday page with Dille. Dille testified that he knew nothing of this feature until January 6th or 7th. There is no evidence supporting plaintiff's contention that the submission of the material to the newspapers in December was on behalf of Cooper, individually, and not by Cooper as salesman for plaintiff.

█ Plaintiff's counsel characterize as "additional major breaches of loyalty by Cooper," his refusal on January 8th to "instruct Folger to sign the contract," as requested by Dille, and his refusal to tell Folger to sign the contract, as requested by Bob by telephone from Cincinnati on January 9th. What we have said hereinbefore in connection with plaintiff's contention that it was Cooper's duty to assist in the negotiation of the contract with Folger, disposes of plaintiff's claim that Cooper's refusal to instruct or tell Folger to sign

the contract was an act of disloyalty to plaintiff and a breach of Cooper's duty.

If as plaintiff contends, Cooper, notwithstanding his resignation on January 8th, was an agent of plaintiff to procure a written contract from Folger, Cooper's refusals are not breaches of his obligations to plaintiff. After Bob and Folger had gone over the December contract at Cincinnati on January 8th and modified it in accordance with what each believed to be fair, Folger, in answer to Bob, said that he would not sign the contract, but that if Cooper "agreed to the contents therein, if he approved of this, that I would sign it." This testimony is not contradicted. In asking for Cooper's agreement to and approval of the terms of the contract, Folger was not asking for a perfunctory act of agreement and approval in compliance with the command or request of the Dilles. We must assume he wanted the unbiased, honest and reasoned judgment of Cooper. Folger was new in the syndicating field. The contract was important in that it bound him to plaintiff for at least five years, and an additional five years at plaintiff's option. It gave to plaintiff important, if not exclusive rights in the fruits of Folger's creative talents and their by-products. He had consulted two lawyers about signing the September contract, and rejected it. The December contract was presented to him without advance notice and he was asked to sign it immediately, without consultation with a lawyer or other persons. He was grateful to Cooper, who had guided him into the syndicating business. He recognized that Cooper had the experience which he lacked. Folger wanted protection—in effect, to make Cooper his fiduciary. Cooper would thereby become the fiduciary of plaintiff and of Folger—two parties dealing at arm's length—a dual capacity which equity abhors. Cooper could not fulfill his obligations to Folger by giving to plaintiff the blind obedience it demands.

Folger went along with plaintiff for more than a month after Cooper's resignation. He supplied the necessary drawings and material required for the publication of the cartoon, to and including March 13th. He broke off his relations with plaintiff in an emotional outburst in a restaurant in Chicago when the three Dilles demanded that he declare his position, whether he would continue or discontinue his relations with plaintiff. About a week later, in response to a request from Bob that his position be definitely stated, he wrote plaintiff on February 23rd terminating all relation with plaintiff. There is no evidence that Cooper, Thompson or Carr, or anyone in their behalf, ever attempted, directly or indirectly, to influence Folger in this action. He testifies affirmatively that he decided on his own hook not to deal with plaintiff, and that none of the defendants ever told him they did not want him to contract with plaintiff or that they would like to have him enter into a contract with them. This statement is not contradicted by testimony, fact or circumstance. The defendants testify to like effect. This testimony cannot be disregarded. Having severed his relations with plaintiff, effective March 13, 1954, Folger was at liberty to offer his cartoon to defendants, and the defendants were equally free to accept it.

What we have said applies to the Bishop contract. There is no evidence that either of the defendants had any part in bringing the Bishop feature to plaintiff. Thompson had edited Bishop's work for years and a friendly relation had been established between them. There is no evidence of probative value that either of the defendants solicited or tampered with Bishop prior to their separation from plaintiff. Bishop had extra space in his office suite, and defendants, acting through Thompson, rented this space. No sales of the Bishop feature had been made for approximately two years. The last sale had been made by Bishop to

145

a former employer. The returns from the feature were small, and although Bishop had uttered no complaint against the handling of it by plaintiff, the transfer of the feature to defendants, where Thompson could continue to edit it, was probably only natural. Conjecture and surmise cannot take the place of the positive, uncontradicted evidence. Folger and Bishop having acted independently, of their own accord and without being influenced in severing their relations with plaintiff, defendants were free to contract with them, and the court erred in refusing to dissolve the injunction.

The order appealed from is reversed, the cause is remanded with directions to dissolve the injunction and for such further action in conformity with this opinion as may be advisable.

*Reversed and remanded with directions.*

BURKE, P. J. and FRIEND, J., concur.