James B. BATTLE, Jr., Executor, et al.,
Plaintiffs in Error,

v.

Magnolia MASON and Maude Hurst,
Defendants in Error.

In re MEADORS' ESTATE.

No. 36309.

Supreme Court of Oklahoma.

Dec. 6, 1955.

Embry, Crowe, Tolbert, Boxley & Johnson, by V. P. Crowe and Val R. Miller, George M. Nicholson, Looney, Watts, Ross, Looney & Nichols, Oklahoma City, for plaintiffs in error.

Cargill & Cargill, Charles Hill Johns, B. H. Carey, Wayne W. Bayless, Oklahoma City, for defendants in error.

WILLIAMS, Vice Chief Justice.

This appeal concerns a will contest. C. F. Meadors executed the will in question on May 5, 1950. Testator died on January 13, 1952, and on February 5, 1952, said will was admitted to probate by the County Court of Oklahoma County. On June 30, 1952, testator's two daughters by his first marriage, Magnolia Mason and Maude Hurst, filed their petition in contest of said will, and on February 9, 1953, filed their amendment thereto. On March 17, 1953, the county court denied the contest and refused to revoke the probate of said will. Contestants thereupon took an appeal to the district court, and the district court, after a trial de novo, reversed the county court and ordered probate of said will revoked. Proponents have in due course perfected their appeal to this court.

As their first proposition of error, proponents urge that the county court and the district court on appeal had no jurisdiction of the will contest on account of insufficiency of the petition in contest and lack of filing of a sufficient such petition within the time allowed by statute. The question was presented to the county court by motions to strike the entire contest, which were overruled. The same motions were presented to the district court at the commencement of the trial de novo, and again overruled, and proponents' objection to the jurisdiction of the court, based on the same grounds, was also overruled.

Our statutes provide two methods of contesting a will. 58 O.S.1951 § 41, provides for contest prior to probate and 58 O.S.1951 § 61, provides for contest after probate. The latter section, pursuant to which this contest was instituted, reads as follows:

"When a will has been admitted to probate, any person interested therein may at any time within one year after such probate, contest the same or the validity of the will. For that purpose he must file in the court in which the will was proved a sworn petition in writing containing his allegations, that evidence discovered since the probate of the will, the material facts of which must be set forth, shows:

"1. That a will of a later date than the one proved by the decedent, revoking or changing the former will, has been discovered, and is offered; or,

"2. That some jurisdictional fact was wanting in the former probate; or,

"3. That the testator was not competent, free from duress, menace, fraud, or undue influence when the will allowed was made; or,

"4. That the former will was not duly executed and attested."

■ The original petition in contest, filed on June 30, 1952, merely shows that on a certain date the will of decedent was admitted to probate and that contestants are the only children of decedent, following which are five allegations of grounds of contest and a prayer that the probate of said will be set aside. Such petition contained no allegation that evidence discovered since the probate of the will showed any of the grounds for contest relied on nor did such petition set forth the material facts of any such evidence. It is even doubtful that such petition could properly be called a sworn petition. Such petition is signed at the end by contestants and there is attached thereto what appears to be a verification. Such verification is in the usual form and is prepared for both contestants, but does not appear to have been signed by either of them, although the jurat of the notary public which follows recites that it was subscribed and sworn to before such notary public. In any event, regardless of whether such petition is or is not sworn to as required by statute, it is otherwise fatally deficient as above pointed out, so that it was not sufficient to confer jurisdiction upon either the county or district courts. In re Impunnubbee's Estate, 49 Okl. 161, 152 P. 346. The syllabus in that case is as follows:

"In a proceeding to contest the validity of a will, after the same has been admitted to probate, instituted in the county court pursuant to section 6219,

Rev.Laws 1910, by 'any person interested therein,' upon any of the grounds of contest provided by section 6210, Rev.Laws 1910, it is mandatory upon such person to 'file in the court in which the will was proved a sworn petition in writing containing his allegations, that evidence discovered since the probate of the will, the material facts of which must be set forth,' shows the existence of the statutory ground or grounds for contest relied upon to avoid the deed."

■ The instrument filed by contestants on February 9, 1953, is denominated by them as an amendment to the petition in contest filed on June 30, 1952. Proponents contend that it is actually a new contest filed without permission of the court and after the time allowed by law for filing a contest had expired and is therefore not sufficient to invoke the jurisdiction of the court. The instrument in question, although denominated an amendment, is actually complete in itself and reiterates all the grounds for contest contained in the original petition in contest but in considerably more detail. It contains an allegation that evidence in support of such grounds was discovered by contestants after the will was admitted to probate and is properly verified. Such instrument is in compliance with all the statutory requirements for a petition in contest after probate except that it was not filed within the time allowed by law and it does not set forth the material facts of the evidence discovered after probate. We are of the opinion, however, that it is immaterial whether the same be considered an amendment or a new contest, or whether the same was filed with or without authority of the court, since the identical situation was before this court in the case of Voght v. Hall, 203 Okl. 670, 225 P.2d 822, 823, and such case is decisive here. In that case contestants filed within the time allowed by law a petition in contest after probate which was deficient in the same respects as the one in the case at bar, and then after the time allowed by law attempted, with permission of the court, to amend such petition so as to eliminate the deficiencies

therein. The county court overruled proponents' motion to strike such contest but the district court reversed and contestants appealed to this court. In affirming the district court's judgment, this court said, in the body of the opinion:

"Under the statute, 58 O.S.1941, § 61, the contesting petition must be filed within one year after the probate. The will herein was probated on November 14, 1946. The petition was filed on the last day of the limitation period, November 14, 1947. The statute provides that the contestant must 'file in the court in which the will was proved a sworn petition in writing containing his allegations, that evidence discovered since the probate of the will, the material facts of which must be set forth'. The petition so filed was not sworn to and did not contain an averment that the evidence relied on was discovered since the probate of the will. On November 17, the third day following the filing of the petition, the County Court permitted contestants to attach to the petition a written verification thereof. The court found that the verification had been previously prepared therefor but through inadvertence was not attached to nor filed with the petition, and ordered that the amendment was to be effective as of the date the petition was filed. And, on overruling the motion to dismiss, the court, by order, permitted contestants to further amend the petition by supplying the omitted averment above mentioned.

"The judgment of the District Court is correct. Any question of the want of jurisdiction in the County Court to entertain the petition is foreclosed by the holding in In re Impunnubbee's Estate, 49 Okl. 161, 152 P. 346, wherein it is held: 'In a proceeding to contest the validity of a will, after the same has been admitted to probate, instituted in the county court pursuant to section 6219, Rev.Laws 1910, by "any person interested therein," upon any of the grounds of contest provided by section 6210, Rev.Laws 1910, it is mandatory upon such person to "file in the

court in which the will was proved a sworn petition in writing containing his allegations, that evidence discovered since the probate of the will, the material facts of which must be set forth," shows the existence of the statutory ground or grounds for contest relied upon to avoid the deed.'

"The petition therein was sworn to but contained no allegations of facts other than the statutory grounds of contest. The court there said: 'Whilst this petition is verified by the contestant, there is no effort to comply with the part of the statute which provides that the contestant "must file in the court in which the will was proved a sworn petition in writing containing his allegations, that evidence discovered since the probate of the will, the material facts of which must be set forth," shows any of the grounds of the contestant were not known, at the time the will was offered for probate.'

"And touching the legal effect of the non-compliance with the statute there is said: 'In our judgment, the petition filed by the contestants does not state facts sufficient to confer jurisdiction upon either the county or district courts to entertain a contest to determine the validity of a will, after the same has been admitted to probate.'

"There can be no question of the insufficiency of an unverified petition where the statute in express terms makes a sworn petition necessary.

"Since the jurisdiction of the court was not invoked by the petition filed and could not have been invoked by any petition filed thereafter, the court was without jurisdiction to authorize either of said amendments and the same had no effect in law."

Contestants attempt to distinguish the Voght case, supra, from the case at bar by pointing out that the original contest in the Voght case was not verified whereas the original contest here was properly verified and that such lack of verification was the real basis for the holding in that case. We find no such distinction to exist, however. In the first place, as already pointed out, there is grave doubt that contestants' original petition could properly be called a sworn or properly verified petition. In the second place, the holding in the Voght case, supra, was not bottomed solely on the lack of verification of the petition in contest but rather upon the failure to comply with the mandatory provisions of the statute. The fact that contestants in the Voght case failed to comply with the mandatory provisions of the statute in three different respects, whereas contestants here may have failed in only two respects does not place these contestants in any different or better position than those in the Voght case. It is not a question of degree of compliance with the statute, but merely a question of compliance or non-compliance. Contestants in the Voght case did not comply with the mandatory provisions of the statute and contestants here did not comply with such mandatory provisions. The same law is therefore applicable to both. It seems apparent that under the above cited authority both the county court and the district court erred in overruling proponents' motions to strike the contest.

Contestants also argue that the principles of waiver and estoppel preclude proponents from asserting their motions to strike the contest and cite numerous cases involving a waiver of jurisdiction of the person. Such cases are not in point here. There can be no doubt that the question of jurisdiction over the person can be waived by the entry of an appearance. We are not here concerned with a question of jurisdiction of the person, however, but rather with the questions of jurisdiction of the court otherwise and failure of the petition in contest to state a cause of action. Such questions are not waived, at least by any such actions as are here attributed to proponents. 12 O.S.1951 § 269; Mayor v. Bennett, 199 Okl. 579, 189 P.2d 186; Boarman v. Home State Bank, 111 Okl. 285, 239 P. 579; State National Bank of Shawnee v. Wood & Co., 88 Okl. 292, 212 P. 1002; Antene v. Jensen, 47 Okl. 352, 148 P. 727.

Although our holding on the first proposition of error would normally be sufficient to dispose of this case, the nature of the case and the allegations that have been made herein impel us to the view that justice will best be served by a complete review of the record herein and a consideration of every proposition of error presented by this appeal.

The so-called amendment to contest of will filed by contestants alleges four different grounds of contest and contains some most vicious allegations of fraud, duress, misrepresentation, forgery and conspiracy directed at the attorney who drew the will, the executor named in the will and one of the residuary legatees named in the will. At the trial, however, the only ground alleged which contestants were able to support with any evidence at all was their allegation that testator was incompetent at the time of the execution of the will. All other allegations were not only not supported by any evidence at all, but certain of them such as conspiracy and forgery were shown to be completely false and baseless. The trial court found that decedent was not possessed of sufficient mental capacity to make and execute a valid last will and testament on May 5, 1950, and as their second proposition, proponents contend that such finding is against the clear weight of the evidence. We are convinced, from an exhaustive review of the voluminous record herein, that such contention is well taken.

Contestants, who were 59 and 60 years old respectively at the time of the trial, were decedent's only children by his first marriage. Such marriage had been dissolved by divorce prior to 1897 in the State of Arkansas when the older of the two daughters was but 3 years old. Contestants and their mother thereafter remained in and continued to reside in the State of Arkansas, but decedent came to Oklahoma, where, in 1897, he remarried. This second marriage lasted until the death of the second wife some 52 years later in 1949. In 1916 decedent and his wife moved to Oklahoma City, where he resided until his death on January 13, 1952. During his lifetime decedent accumulated an estate which after his death was appraised at the sum of $1,310,205.85.

For a number of years prior to his death Meadors had suffered from prostate trouble for which he had been treated by several doctors. For a good many years Meadors had employed his brother, Lewis Meadors, to manage his rental properties, collect rents therefrom and take care of necessary repairs. In 1948 Lewis Meadors was replaced by his nephew, James B. Battle, Jr., who thereafter managed such rental property. Meadors, himself, however, continued to actively oversee and supervise his properties, and up until about May 30, 1950, continued to drive his own automobile and come to his office regularly. After the death of his wife in 1949, Meadors was appointed and acted as administrator of her estate, which estate was closed in July, 1950.

Some time prior to May 5, 1950, the date on which the will in question was executed, Meadors called his attorney, George M. Nicholson, to come to his office to discuss the making of a will. Nicholson went to Meadors' office and discussed the matter with him, finally suggesting that Meadors prepare a list of the beneficiaries and how he wanted his property divided. Meadors subsequently brought such information to Nicholson's office and a will was drafted in accordance with Meadors' directions. By the terms of such will, Meadors' two daughters, the contestants herein, were bequeathed the sum of $50,000.00 each, eleven of his nieces and nephews were bequeathed $1,000 each, the First Baptist Church of Oklahoma City was bequeathed $1,000, and the residue of the estate, after payment of all debts and taxes, was devised in equal shares to his living brothers and sisters, with the exception of Lewis Meadors, who was bequeathed $1.00. Such will was not executed, however, but was taken by Meadors who later called Nicholson and told him he wanted it rewritten so that his two daughters would receive $75,000 each instead of $50,000. The will was rewritten as directed and taken by Meadors, who on May 5, 1950, returned with it to Nicholson's

office and executed the same in the presence of Nicholson and in the presence of Nicholson's secretary, Hazel Gray, who predeceased Meadors. At the time of the execution of the will a discussion was had concerning the nature of Meadors' estate, at which time Meadors enumerated the various properties owned by him and placed an estimated value on each one. The total of his estimated values was approximately $1,300,000. Meadors then took the executed will and went to the First National Bank & Trust Co. where he deposited the same in his safe deposit box. He then went to the office of Dr. John M. Roddy, in the Apco Tower Building, where he was treated by Dr. Roddy.

On May 29, 1950, Meadors wrote a letter to the Liberty National Bank, authorizing James B. Battle, Jr., to sign checks on Meadors' account there. On May 30, 1950, Meadors went to John Hopkins Hospital in Baltimore, Maryland, and returned home therefrom on June 11, 1950. On July 2, 1950, Meadors was admitted to St. Anthony Hospital in Oklahoma City, where he remained until August 15, 1950, at which time he was discharged and returned to his home. From that time on he remained in his home most of the time until his death January 13, 1952.

Contestants relied upon eleven witnesses to make their case, none of whom had seen testator on the day he executed the will. Those witnesses were: Maude Hurst and Magnolia Mason, the contestants, Vaughn Mason and Curtis Mason, sons of Magnolia Mason, Manila Ligon, a niece of Meadors' deceased wife, Jack Ligon, son of Manila Ligon, Drs. Prosser and Adams, two medical doctors who never saw or heard of Meadors during his lifetime and who testified in response to hypothetical questions, Corinne M. McGlumpy, Meadors' housekeeper and practical nurse from August, 1950, until his death, who never saw Meadors until 3 months after the will was executed and until after his serious illness in St. Anthony Hospital, C. C. Breeding, an elderly public accountant who made Meadors' tax returns for many years and who said he saw Meadors about once a month, and Frank Bookstore, who said he saw Meadors one spring, but couldn't recall the year. Each of these witnesses expressed an opinion that testator was not mentally competent to make a will on May 5, 1950. Maude Hurst, Magnolia Mason, Vaughn Mason, Curtis Mason, Manila Ligon and Jack Ligon may all be classed as interested witnesses, and in any event their testimony established nothing more than old age, a lack of neatness, bladder trouble, grief over the death of his wife of over 50 years, and occasional forgetfulness on the part of testator. Drs. Prosser and Adams both testified in response to a lengthy hypothetical question that testator was incompetent, but neither had ever seen or examined testator and both answered questions on cross-examination to the effect that testator was competent if the hypothesis given by the cross-examiner were true. In evaluating the testimony of these two experts, the language we used in In re Williams' Estate, 207 Okl. 209, 249 P.2d 94, 98, is most apt. Therein we said:

"In evaluating their testimony in the light of the other evidence produced in the case, we think the language contained in In re Rich's Estate, 79 Cal. App.2d 22, 179 P.2d 373–379, is peculiarly applicable. In that case the court said:

"‘ ‘ "The witnesses were skilled alienists, it may be conceded, but the evidence thus adduced of one who has never seen the person, and who bases his opinion upon the facts given in a hypothetical question, is evidence the weakest and most unsatisfactory. Such questions themselves are always framed with great particularity to meet the views of the side which presents the expert. They always eliminate from consideration the countervailing evidence, which may be of a thousand fold more strength than the evidence upon which the question is based. They are astutely drawn, and drawn for a purpose and that purpose never is the presentation of all the evidence. It is never to present the fair and accurate view, but the purpose always is to frame a question such that the answer will announce a predetermined

result. This kind of expert testimony, given under such circumstances, even the testimony of able and disinterested witnesses, as no doubt these were, is in the eye of the law of steadily decreasing value." Furthermore, there was no showing in the testimony of the psychiatrist that the insanity, with which in his opinion testatrix was afflicted, was of such a character that except for it she would have divided her property in a way other than she actually did. In other words, the testimony of the alienist did not establish the fact that the abnormality of mind which he ascribed to the testatrix had a direct influence on her testamentary act when she executed her holographic will.' "

The only other testimony worthy of note offered by contestants was that of C. C. Breeding, the elderly accountant. Breeding testified that he had done bookkeeping and made income tax returns for testator since about 1931; that up until 1945 testator would always question him about the tax returns and complain about his taxes being so high, but after 1945, testator never questioned the returns but just signed them after witness assured him they were correct and that testator's failure to question the returns was one reason witness thought testator was incompetent; that the returns were correct and that there was no reason to question them; that in later years witness didn't think testator gave him the correct answers when witness would ask him for information for use in preparing tax returns. Witness could not say how many times he had seen testator in 1949 or 1950, or how often testator had come to the office during that time. He seemed to recall seeing testator only once in 1950. In county court, however, this same witness had testified he had seen testator about once a month and that he didn't think he was qualified to testify concerning testator's competency. He finally testified, however, that in his opinion testator was not of the mentality to know the kind of property he had, the value of it, substance of it, location of it, income from it and amount of money he had in the bank, because the witness

didn't believe a man could have that much property and answer that kind of question about all those items; that a man would have to have a wonderful mind at any age to do that; that testator had too much property to know what property he had. This witness' testimony was impeached by the testimony of Lewis Meadors and Edward H. Kiecolt, an agent for the Bureau of Internal Revenue. Contestants also relied quite heavily upon a written notation in the St. Anthony Hospital records made by Dr. Walker Morledge on July 8, 1950. Such notation is as follows:

"He is very senile—does not know where he is or the date, or the year. His memory is very poor—he cannot feed himself. Gave phys. exam—body in fair condition; reflexes good.

Diag.—senile arterio sclerotic—cerebral type

Very poor prognosis—will require care for the rest of his life.

Morledge".

Dr. Morledge testified, however, that he made such notation after seeing Meadors for the first time in his life in St. Anthony Hospital on July 8, 1950, when Meadors was very ill, and that subsequent developments had proven the diagnosis made that day to be completely wrong. Dr. Morledge testified that he had seen and treated Meadors a number of times after his discharge from St. Anthony Hospital and that Meadors was at all such times mentally competent and had a good memory; that as a result of further and later observation and treatment of Meadors and the results obtained he now agreed with the diagnosis of Dr. Basil A. Hayes and believed his own initial diagnosis to be completely in error.

In contrast with contestants' witnesses, proponents produced some 36 witnesses who testified as to testator's competency. Of the witnesses, only 4 could be said to be interested witnesses. Proponents' witnesses consisted of three doctors, all of whom had seen and examined testator during his lifetime, one of them on the very day the will was executed, the housekeeper who served testator at the time of the execution of the will and who observed him daily, the

next door neighbors on either side of testator's home who had lived there for a number of years and had almost daily contact with testator, a registered nurse who had cared for testator in St. Anthony Hospital and in his home after his release from the hospital, the manager of the safe deposit vault in which testator placed the will on the date of its execution, the lawyer who drew the will and witnessed its execution, business acquaintances and associates of many years standing who had frequent contact with testator, people who officed in the same building as testator and saw him almost daily, testator's barber, his clothing salesman and other longtime friends and acquaintances, as well as an agent of the Bureau of Internal Revenue. At least five of these witnesses had seen testator on the day the will was executed. The testimony of these witnesses is positive, convincing and unimpeached. While time and space do not permit a detailed account of all of such testimony, at least a portion of it must be recounted.

Dr. John A. Roddy testified that he has been a practicing physician in Oklahoma City since 1918; that he had known and treated Meadors since 1946; that Meadors had a cardiac condition and also some urinary trouble and that witness saw him and treated him on an average of once to twice a week from 1946 until about the last of June, 1950; that most of such visits had been at the doctor's office, although a few had been at Meadors' home; that on May 5, 1950, Meadors had come alone to the witness' office in the Apco Tower and witness had talked with him at that time; that Meadors looked like the average successful business man, was clean and properly clothed; that Meadors was competent all the time witness knew him; that Meadors' mental capacity and attitude was extraordinarily good.

Ruby Green testified that she is a practical nurse; that she was employed by Meadors as a housekeeper from October 17, 1949, to July 27, 1950, and saw Meadors every day; that up until May 30, 1950, Meadors went to his office every day; that he put on clean clothes every day before going to the office and was clean when he got back home; that he was never slovenly or dirty in his personal appearance; that he had prostate gland and bladder trouble but that he was mentally competent and very alert; that after he returned from John Hopkins Hospital on June 11, 1950, he was a little weaker physically than he had been before, but was just as alert mentally as he had been before and transacted his business at home after that; that he was mentally competent to know the nature and extent of his property and to whom he wanted his property to go.

Dr. Basil A. Hayes, an Oklahoma City physician, testified that he treated testator in 1939, 1940, 1941 and from about June 15, 1950 to June 9, 1951; that testator had a prostatic enlargement which required treatment from time to time; that from June 15, 1950 to June 9, 1951, he saw testator about once a week except while testator was in St. Anthony Hospital, (July 2, 1950–August 15, 1950) during which time he saw testator twice a day; that while in St. Anthony Hospital testator became uremic and suffered from uremic poisoning for about a week to ten days during which time he was practically unconscious; that that was the only time testator had uremia and that testator was competent at all times except for the short period he was unconscious due to uremia.

Edward H. Kiecolt testified that he was an accountant for the Internal Revenue Agency with the duty of making field examinations of income tax returns; that on May 2, 1950, he commenced an examination of the income tax return of C. F. Meadors; that in the course of such examination it became necessary for him to have additional information pertaining to some of the transactions involved in Meadors' tax return; that James Battle, Jr., and C. C. Breeding, who were both present, were unable to supply the necessary information; that witness then conferred with Meadors personally and Meadors was able to immediately supply the needed information; that witness worked with, conferred with and talked to Meadors for at least a half a day and that Meadors was extremely capable and certainly competent to transact business; that some of the information re-

quired by witness pertained to matters that required going through a couple of other transactions and ending up with a transac- tion occurring back in 1910, and that Mead- ors was able to supply such information easily from memory; that C. C. Breeding was present at the conference with Mead- ors but Breeding could not supply the in- formation required. This conference with Meadors occurred on May 3, 1950, just two days before the will was executed. Wit- ness saw Meadors again in June, 1950, and had another conference with him at that time and Meadors' condition at that time was good and had not changed since he saw him the first time.

John Gillespy and Opal Gillespy were husband and wife and lived next door to Meadors from 1942 to July, 1950. They testified they saw Meadors almost daily and visited with him frequently; that Meadors was always neat and clean in appearance and up until he went to John Hopkins (May 30, 1950) drove his car to work practically every day; that in Febru- ary, 1950, they sought his advice in connec- tion with the purchase of a piece of prop- erty and later negotiated a loan from him to complete such purchase and in 1951 se- cured an increase of such loan; that Mead- ors was fully competent.

Testimony that Meadors was competent was also given by C. B. Warr, who had known Meadors since 1922 and saw him nearly every week and tried to buy some property from him in May, 1950; by Claude W. Martin, who leased some land from Meadors in May, 1950; by Colonel H. Nelson, who had known Meadors 15 years, officed in the same building with him and since 1947 saw him almost daily; by A. P. Knight, who lived next door to Mead- ors for 20 years and saw him nearly every day; by O. H. McKee, the manager of the Ponca City Savings & Loan Ass'n, who had known Meadors for 20 years and saw him on an average of 3 or 4 times a week; by J. C. Todd, who had known Meadors 15 years and tried to buy some royalty from him in May, 1950, and did buy some royalty from him in July, 1951; by Velma Wilcox, a registered nurse, who attended Meadors from July 4, 1950, to June 15, 1951; by

W. M. Randle, who leased a service station from Meadors in October, 1949, and saw him every week thereafter until he went to the hospital in 1950; by Nell C. Harris, who had known Meadors since 1929, officed across the hall from him and saw him near- ly every day; by Grover D. Strother, the manager of the safe deposit vault of the First National Bank & Trust Co., who saw Meadors on May 5, 1950, when he came to put his will in the safe deposit vault; and by many other friends, associates and ac- quaintances of Meadors of long standing.

■ A presumption of sanity goes with everyone, and the burden of proving testamentary incapacity in a will contest rests on the contestant. In re Martin's Es- tate, 199 Okl. 567, 188 P.2d 862; In re Blackfeather's Estate, 54 Okl. 1, 153 P. 839. It is true that the contestants appear here with the advantage of having a judg- ment of the district court in their favor, and this fact should and does have a great weight here, but it is not controlling for this is a case of purely equitable cognizance and this court should weigh the evidence and render or cause to be rendered such judgment as the trial court should have rendered. In re Chubbee's Will, 133 Okl. 156, 271 P. 681; In re Blackfeather's Es- tate, supra; Anderson v. Davis, 208 Okl. 477, 256 P.2d 1099.

While the burden of proof was upon the contestants it appears to us that the pro- ponents have not only met the attack, but have gone further and proven almost con- clusively that the decedent was of sound and disposing mind and memory at the time he executed the will in question and was fully conscious of what he was doing, and that the terms of the will expressed his own desire in the disposition of his property. In re Blackfeather's Estate, supra.

■ Contestants object to the participa- tion of two of the present justices of this court in the consideration of the petition for rehearing herein on the grounds that one of them was elected to the court and the other appointed to the court after the promulgation of the original opinion of the court herein. It is apparently contestants' position that only those justices who par-

ticipated in the consideration and adoption of the original opinion are entitled to participate in the consideration of a petition for rehearing thereafter filed. Such contention is obviously without merit since to so hold would violate the plain provisions of the constitution of this state.

Once an appeal has been duly perfected to this court in any given cause, such cause is within the jurisdiction of this court until the same has been finally disposed of by the issuance of a mandate therein. Jurisdiction of such cause is vested in this *court*, however, and not in the various justices thereof or some of them. By virtue of the provisions of Article 7, § 3, of the Constitution of Oklahoma, a majority of the members of the Supreme Court shall constitute a quorum, and the concurrence of the majority of said court shall be necessary to decide any question. The filing of a petition for rehearing in any cause pending in this court presents a question to the court for its decision. Such question, by virtue of the constitutional provision above cited, can only be decided by the concurrence of the majority of the court. To grant contestants' request that the question be decided by only a part of the court or a particular group of justices would clearly be in violation of the constitution and statutes of this state. While both sides to this controversy have a constitutional right to a judgment herein by a duly constituted *court*, neither side has a right, constitutional or otherwise, to a decision by any particular group of justices thereof.

It has been the settled policy and practice of this court since statehood that every member of this court upon qualifying shall immediately commence his participation in all matters then pending before the court. So far as we know, this is the first time such practice has ever been questioned. We are cited no constitutional provision, statute, or previous decision of this court which would constitute a basis for changing a practice followed for over 40 years. Contestants cite a number of cases for other jurisdictions, a few of which do seem to sustain their position. There is nothing in such cases that is controlling here, however. The rule adopted in such cases is one of judicial policy only. The most recent and comprehensive opinion in which the question here presented was considered by any court that we have been able to discover is that rendered in Glasser v. Essaness Theatres Corp., 346 Ill.App. 72, 104 N.E.2d 510, subsequently affirmed by the Supreme Court of Illinois on January 22, 1953, in 414 Ill. 180, 111 N.E.2d 124. In that case the court made a complete review and analysis of all the decisions bearing on the problem, including those cases cited and relied on here by contestants, and concluded that there was no merit in the contention advanced. We see no need to repeat the comprehensive review contained in that case since the opinion therein is so complete, logical and persuasive that further discourse upon the question there treated is completely unnecessary, except to state that our views coincide with the views therein expressed.

Contestants' motions directed at preventing duly qualified and acting justices of this court from participating in this case are therefore denied.

The judgment of the district court is against the clear weight of the evidence. It is therefore reversed with instructions to enter judgment upholding the validity of the will.

DAVISON, HALLEY, BLACKBIRD and JACKSON, JJ., concur.

JOHNSON, C. J., and WELCH and CORN, JJ., dissent.

CORN, Justice (dissenting).

I dissent to the present opinion and the withdrawal of the opinion of November 16, 1954.

The original petition and contest, while it does not use the exact words of the statute "discovered since the probate of the will", 58 O.S.1951 § 61, it does by the use of other words clearly convey the impression, and does definitely imply that these contestants, who were residents of Arkansas, discovered the evidence on which their contest was predicated between the probate of the will and the filing of the contest several months later. Furthermore,

that was proven to be so by positive evidence in the District Court, which evidence was received without objection, and there was no contradictory evidence at all. It has never been necessary or proper to hold such allegations must be in the exact words of the statute, if the substance was there.

After the contest was filed the proponents appeared and filed a motion to strike one paragraph of the contest, and a motion requesting the county court to require the contestants to make the other allegations of the contest more definite and certain. No objection was then interposed by proponents which is now urged by them. Thereafter, before the contest had been made more definite and certain, upon October 16, 1952, proponents filed an answer to the merits of the contest, and in such answer prayed for affirmative relief against contestants.

Upon February 9, 1953, long after proponents had made such general appearance, and long after proponents had filed their answer to the merits seeking affirmative relief, they filed their motion to strike the contest from the files thereby raising, for the first time, the question they now claim to be jurisdictional. An entirely different question is here presented than would be presented if proponents had made a timely objection to the jurisdiction, and the lower court had overruled the same, and they had preserved such question and thereafter answered upon the merits specifically reserving such jurisdictional question for review. But herein, proponents having made a general appearance and filed an answer to the merits and even prayed for affirmative relief therein, they cannot thereafter, for the first time, be heard to complain that contestants did not substantially comply with our statute.

In the early case of Scott v. McGirth, 41 Okl. 520, 139 P. 519, 524, this court held such an objection as now made was waived if not timely made. There a contest after probate was filed, *but the same was neither signed nor verified as required by our statute.* Proponents there filed a demurrer which does not raise the present question. It was their claim, as here, that the alleged defect in the contest constituted a lack of jurisdiction of the subject matter and could be raised at any time, and could not be waived. This Court held such jurisdictional objection must be timely made, and if not timely and properly made, could not be raised at a later time but had been waived. This Court there said:

"The other point raised by plaintiff in error is that the petition was not signed or verified as required by section 5166, supra. We cannot agree with plaintiffs in error on this question. Had they filed a motion to strike the petition for the want of signature or verification, same no doubt would have been sustained by the trial court; but they did not elect to do so, but filed a general demurrer, which does not raise this question. The question as to the signing and verification of a petition cannot be raised for the first time on appeal in this court. Warner v. Warner, 11 Kan. [121] 122; Gilmore v. Hempstead, 4 How.Prac., N.Y., 153; Fritz v. Barnes, 6 Neb. 435; Toledo Agricultural Works v. Work, 70 Ind. 253; State ex rel. Ruhlman v. Ruhlman, 111 Ind. 17, 11 N.E. 793; Payne, Huntington & Co. v. Flournoy, 29 Ark. 500; 8 Ency. Pleading and Practice, 206."

The case of Voght v. Hall, 203 Okl. 670, 225 P.2d 822, relied upon by proponents is not applicable to the facts in the record in this case. In the Voght case, supra, the contest was unverified and filed on the last statutory day for the filing thereof. Promptly and timely a proper motion to strike the contest from the files challenging the defect upon jurisdictional grounds was made and filed. There was no general appearance or answer to the merits made and filed in the Voght case, supra, prior to the filing of the Jurisdictional motion to strike therein. The question here presented, and presented and decided in Scott v. McGirth, supra, was not presented, or passed upon by this court in the Voght case, supra.

The motion to strike the contest from the files here presented was not timely made

and the same has been waived. See Scott v. McGirth, supra; Pine v. Hill, 158 Okl. 277, 13 P.2d 154; Miller v. Weston, 25 Colo.App. 231, 138 P. 424, 427.

The testator, C. F. Meadors, was 79 years of age when the will was made. For some years prior to the date of the will he was afflicted with arteriosclerosis described by physicians as being of the cerebral type and progressive. There was convincing evidence that some two weeks to two months after the date of the will he was noticeably in very bad mental condition, and thereafter continued under daily care of trained nurses and physicians until his death. This condition after the date of the will is not necessarily proof of his condition on the date of the will, but such proof is more important and convincing in such a case as this where testator was afflicted with the progressive ailment above recited. Also, before the date of the will, testator suffered from prostate trouble with operations therefor.

If the investigator of the record should take evidence for proponents to the exclusion of the evidence for contestants, or accept only the evidence for proponents in each case of conflict or contradiction, or value the evidence of proponents as outweighing that in behalf of contestants on each item or detail, then the testator was competent and the trial court's conclusion was wrong. On the other hand, if we accept with verity all of the evidence for contestants, and give it superior weight in each instance over the evidence of proponents, then it could be said with reasonable safety that the testator was not at all competent.

This case offers a fine example of the value of the legal philosophy that much weight should be given to the finding and conclusion of the trial judge, who had each of the numerous witnesses before him and observed the giving of his or her testimony and was in far better position than this court to judge the weight and value to be given each answer of each witness.

Contestants urge in this case that notwithstanding the ground of lack of testamentary capacity there is abundant evidence of (a) undue influence and, (b) the total lack of any explanation of this will insofar as it shows to be or might be construed to be an unnatural will in view of the laws of descent and distribution, and in view of the laws of nature. These grounds of contest require most serious consideration before they could be denied. The present majority opinion does not pass upon these contentions. Under the evidence in the record, these facts, coupled with the facts and decision of lack of testamentary capacity, show clearly the judgment and decision of the trial court was correct and should be affirmed. See Anderson v. Davis, 208 Okl. 477, 256 P.2d 1099; Johnson v. Shaver, 41 S.D. 585, 172 N.W. 676; Flowers v. Flowers, 94 Okl. 134, 221 P. 483; Hunter v. Battiest, 79 Okl. 248, 192 P. 575.

The majority opinion states:

"The so-called amendment to contest of will filed by contestants alleges four different grounds of contest and contains some most vicious allegations of fraud, duress, misrepresentation, forgery and conspiracy directed at the attorney who drew the will, the executor named in the will and one of the residuary legatees named in the will. At the trial, however, the only ground alleged which contestants were able to support with any evidence at all was their allegation that testator was incompetent at the time of the execution of the will. All other allegations were not only not supported by any evidence at all, but certain of them such as conspiracy and forgery were shown to be completely false and baseless."

There is something unusual in this case. The record reflects that an attorney by the name of George M. Nicholson, drew the will. He and his secretary were the only subscribing witnesses on the will. Before the will was presented for probate his secretary died. Nicholson was both witness and attorney in the county court, both witness and attorney in the district court, and

his name is listed on the briefs filed in this court as one of the attorneys for the proponents of the will.

As reflected by the record in this case he voluntarily put himself in this position. The will, according to his testimony, was executed at a time and place where it would have been an easy matter for him to have gotten other subscribing witnesses on the will by stepping across the hall from his office.

The record reflects that he prepared an inventory, showing the property left by the deceased only valued at $500,000, which was subscribed and sworn to by the executor, when he knew the value of the property was $1,300,000. He, in effect, told the daughters of the deceased that after their share (which was $75,000. each) was taken out and the taxes paid, and the expense deducted, there would be little, if anything, left.

I find many other things in the record that has a tendency to discredit his testimony, such as promising to furnish an inventory to the daughters of the deceased, and failing to do so, and the following testimony of himself, James Battles, executor, and Mr. Breeding, auditor for Mr. Meadors, the deceased:

Mr. Nicholson testified as follows:

"Q. Now did he read this will? A. Why I suppose so. He had it a week or so.

"Q. Did he read it in your presence; or did you and him discuss it? A. No. I don't know what he did. He just came in and said the will was all right. And he wanted to sign it. I did not see him read it there."

James Battles testified:

"Q. You know Mr. Meadors had more confidence in you than in anybody else, didn't you? A. I knew he had plenty of confidence in me. * * * He had lots of confidence in me.

"Q. Well, you met these daughters once in a while? You did meet them didn't you? * * * A. Yes, sir.

"Q. Did you say anything to them about this will? A. No, I didn't.

"Q. Why didn't you? A. It wasn't any of my business to say anything to them about it. * * *

"Q. Now, do you think the amount he gave them was sufficient? A. It wasn't any of my business to think about it.

"Q. So it was worth $1,300,000. at the time the will was executed wasn't it? A. That's right. * * * There was about $411,000.00 worth of taxes too.

"Q. Did you tell the girls in any manner, or in any way that you knew what the amount of his estate was? A. No, I didn't."

Battle signed an affidavit:

"That said estate in effect, where no probate of said will has been applied for, does not to the belief and knowledge of this affiant, exceed in value of $500,000.00".

"Q. Now, did you make that affidavit? A. Yes, sir.

"Q. And you knew when you made it, it was worth $1,300,000.00, didn't you? A. Yes, I did, but I didn't know it was worth that exactly.

"Q. What did you do it for? A. I did it because the attorney prepared it. It was prepared that way.

"Q. Yes, did you and Judge Nicholson work together? A. I am the executor and he is the attorney.

"Q. You drew the same fee he did when you went down and got the order? A. Yes, sir. (Note: Amount $15,000 each)

"Q. Had you read the will at that time? A. I only read it while it was read in your office.

"Q. After it was taken from the box? A. No. When you and Mr. Meadors were reading it over in your office."

Mr. Breeding testified as follows:

"Q. I will ask you—if these gentlemen sitting here—all three of them—participated in the conference? A. Yes, sir.

"Q. Now I will ask you if they didn't want you to testify to this, or this in substance. That you were present in Judge Nicholson's office, the day the Will was signed, May 5th, 1950? A. They—Judge Nicholson started the question. And he said, 'You know on the 5th day of May, that you were in Mr. Meador's office'. He says, 'You were over there with one of the Federals and Mr. Meadors wasn't present'. And, I says, Judge Nicholson, I was not present when Mr. Kiecolt and I and Mr. Meadors—Mr. Meadors was not present that day in my presence, nor any other day that I had with Mr. Kiecolt.'

"Q. All right. Now did they—can you answer the question? Whether or not—now, that refers to Kiecolt. But, did they ask you whether or not you would testify that you were present when the Will was made? A. He made the statement there, that I was present in Mr. Meadors' office, with Mr. Meadors and this man that checked his reports, and that I knew the will was made May 5th.

"Q. When did you know the will was made? A. I saw it in the newspaper after it was published.

"Q. That is the first time you knew a Will was made—was after it came out in the newspaper? A. That's right.

"Q. Now, I will ask you, if in the same conference, if Mr. Roberts here, propounded you questions as to whether or not he was competent or incompetent to make a Will, and insisted that he was competent when he propounded the question to you? A. I said, 'I will have to answer, no.'

"Q. Did he ask you the question though? A. Yes, sir.

"Q. And you told him then that you couldn't answer it any other way but 'no'? A. I said, 'I will have to answer it 'No'.'"

The trial court did not believe Mr. Nicholson when he, in effect, testified that the testator was competent and did make the will on the 5th day of May, 1950.

Under the record in this case, without the testimony of the attorney and the executor, neither of whom the trial court believed, it is impossible to say when or where the will was executed. It may be that this will was prepared in Mr. Meadors' absence, without his knowledge or consent and, was signed by the testator at his home a year or more after May 5th, 1950, and just shortly before he died.

Fraud and undue influence are seldom ever proved by direct evidence, because a transaction involving the fraud and undue influence is guarded with the greatest of secrecy to keep it from being discovered. Therefore under the record in this case the judgment of the trial court should not be reversed.

I do not believe it would be proper for this court to say, in effect, to the attorneys of this state there is nothing wrong about you acting as a subscribing witness when you prepare a will for a client, with your secretary as the other witness, and if the will is contested, and you testify at the hearing, and the trial court, even in the face of contradictory evidence, holds the will is not a valid will, all you have to do is just appeal to this court where you can rest assured the judgment of the trial court will be reversed because the trial court erred in not believing your testimony.

The majority opinion gives great weight to the testimony of George M. Nicholson, notwithstanding his dual role of active advocate and witness. Here is what the appellate courts say:

In re Torstensen's Estate, 28 Wash. 2d 837, 184 P.2d 255, the Supreme Court of Washington, said: "An attorney violated code of ethics of the state bar when he acted as attorney in trial of will contest and in Supreme Court where attorney had drawn the will, signed it as a witness, accepted the position of executor, and testified in court."

In the body of the opinion, the Supreme Court of Washington reviewed all of the

decisions of all appellate courts in the United States and said:

"Counsel for appellant has called our attention to the activities of attorney, R. W. Miller, a witness and trial lawyer in this case. They argue little credit should be given to his testimony, in view of his interest in the outcome of this litigation, and his violation of the legal code of ethics. Rem.Rev.Stat. § 139–14, subd. 11, and Rule XI (11), for the discipline of attorneys, 193 Wash. 92–a, provides an attorney or counselor may be reprimanded, suspended, or disbarred for violation of the ethics of the profession. The bar rule further provides that 'the Code of Ethics of the American Bar Association shall be the standard of ethics for the members of the bar of this state.' Rule XIX of the Code of Ethics of the American Bar Association provides when a lawyer is a witness for his client, except as to merely formal matters, such as attestation, or custody of an instrument and the like, he shall leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his clients. Mr. Miller had been Mrs. Torstensen's attorney for many years, and represented her in a court action November 2, 1944, in a case instituted by the O. P. A. Mr. Miller drew the will for Mrs. Torstensen, in which he was named executor to serve without bonds. He and his wife were the only witnesses to the will. Miller also petitioned the court January 22, 1945, to have himself appointed guardian for the estate of Mrs. Torstensen. When appellant filed his petition contesting the will, Miller filed his appearance as counsel for himself as executor, 'and Mabel Guss, the legatee and devisee under the will'. Mr. Garland acted as co-counsel in all subsequent proceedings. Aside from testifying at length during the trial, Miller acted as trial attorney for himself as executor, and Mabel Guss as legatee. During the progress of the trial, Miller examined seven witnesses who testified in support of the will, and addressed objections and observations to the court on four occasions. We are not advised as to the activities of Miller in preparing the brief for respondents on appeal, but we do find his name on their brief as their attorney.

"The case of Johnson v. Shaver, 41 S.D. 585, 172 N.W. 676, 680, involved a will contest in which the contestants claimed that the testator was mentally incompetent at the time he executed his will. The attorney who drew the will acted as counsel for the proponents of the will during the trial, and testified that some time before his death, the testator in detail told of all his property, about his past life, and his children, stated what he wanted to do, and was possessed of sufficient mentality to understand his property and his relatives. The court, in speaking of the evidence given by the attorney and his actions as trial lawyer, stated:

"'We are inclined to think the evidence properly received but solely upon the ground that an attorney who drafts a will is presumed to impartially represent the estate and to be without bias. This presumption may hardly be justified in relation to an issue as to testamentary capacity, as any attorney would naturally hesitate to admit that he had drawn a will for a testator whom he considered to be without testamentary capacity. In this case we find this witness not remaining neutral, but appearing in court upon the trial as one of the attorneys for the proponents of the will. Knowing, as he must, that he would be called as a witness to testify to matters going to the merits of at least one issue raised by contestants, he should, in conformity with the nineteenth Canon of Ethics adopted by the Bar Association of this state and the American Bar Association, have refused to act as attorney for appellants. His evidence is not entitled to that credence to which it would have been entitled if he had preserved that

neutrality that a high sense of professional propriety would have demanded.'

"A will contest was involved in Re Stephens' Estate, 207 Minn. 597, 293 N.W. 90, 93. The grounds of objection to the will were lack of testamentary capacity and undue influence. A jury decided that the execution of the will had been brought about by undue influence. An attorney, W. L. Hursh, drew the will, and signed it as a witness. Hursh testified at the trial as an important witness for the proponents of the will, and actively participated in the trial of the cause, as well as on appeal. In passing upon the actions of the attorney, the supreme court of Minnesota had the following to say:

" 'What has been said disposes of the appeal on its merits. There is, however, another matter which we cannot overlook or refrain from discussing, much as we would like to avoid so doing. In Ferraro v. Taylor, 197 Minn. 5, 12, 265 N.W. 829, 833, we said:

" ' "The practice of attorneys of furnishing from their own lips and on their own oaths the controlling testimony for their client is one not to be condoned by judicial silence. * * * The good name and deservedly high standing of the Minnesota Bar require that the practice be stopped, for nothing short of actual corruption can more surely discredit the profession. * * * By appearing in the dual capacity of counsel and witness, and then necessarily by argument urging upon the judge, as trier of the facts, the truth of their own testimony, * * * counsel for plaintiff have subjected themselves to the results which automatically attend such a spectacle, for a lawyer, 'occupying the attitude of both witness and attorney for his client, subjects his testimony to criticism, if not suspicion.' * * * 'In most cases, counsel cannot testify for their clients without subjecting themselves to just reprehension.' " '

"Interior Woodwork Co. v. Buhler, 207 Wis. 1, 238 N.W. 822, 825, involved, among other things, the evidence of an attorney who testified as a witness for a litigant and at the same time acted as trial attorney in the case. The court said:

" ' * * * we must again condemn the impropriety of an attorney, who knows in advance of a trial that he is a necessary and material witness, and that he will be required to testify to contested facts, also attending and participating in the trial as an attorney for one of the contesting litigants. Harold Paul was the first witness called on behalf of plaintiffs, and then, and again on rebuttal, he testified to the most important contested matters on which plaintiffs relied. Nevertheless, he also, as attorney for plaintiffs, conducted all direct and cross examinations of all other witnesses, and apparently participated in all arguments on the trial as well as in this court. His dual capacity in this litigation is clearly within the condemnation expressed in Roys v. First Nat. Bank, 183 Wis. 10, 20, 197 N.W. 237; Zeidler v. State, 189 Wis. 44, 48, 206 N.W. 872; Borger v. McKeith, 198 Wis. 315, 319, 224 N.W. 102; Baumgartner v. State, 198 Wis. 180, 186, 223 N.W. 419, 224 N.W. 474. The last two cases recognize that unanticipated situations may develop during the course of a trial, because of which the interests of justice may demand that an attorney take the stand, but that, manifestly, did not occur in the case at bar. As stated in the cases cited, the practice offends against rule 19 of the Canon of Ethics of the American Bar Association, which states ethical considerations that must appeal to every lawyer as sound. Because of those considerations, under such circumstances as existed in the case at bar, an attorney should voluntarily retire from the conduct of litigation as soon as the incompatibility in roles becomes apparent, or else his client should forego having him testify as a witness in support of his client's cause.'

"Following this case we find in Re Cieszynski's Will, 207 Wis. 353, 241 N.W. 364, reads:

" 'The sole question upon this appeal is whether the findings are sustained by the evidence, and it is the conclusion of the court that the judgment herein should. be affirmed without opinion. The memorandum is filed solely for the purpose of calling attention to an impropriety upon the part of the attorney for the respondent. Mr. Adamkiewicz drafted the will in question, was an important witness upon the issue of undue influence, and must have anticipated in advance of the trial that his presence as a witness would be required. It appears from the record that he nevertheless appeared and conducted the litigation on himself of the estate. In such a situation, a lawyer should withdraw from the conduct of the litigation, or his clients should forego his testimony.'

"The Supreme Court of Illinois in McKey v. McKean, 384 Ill. 112, 51 N.E.2d 189, 194, had this to say of a witness who acted as attorney:

" 'The course pursued by the attorney in this case would not properly subject him to criticism had the necessity of his going upon the witness stand resulted from some unforeseen event that occurred in the progress of the trial, but that was not so. He instituted the suit. He prepared the complaint. He conducted the case and the examination of witnesses before the master until shortly before he announced his withdrawal as an attorney. It must have been as apparent to him when he dictated the complaint that he believed his testimony would be material, as when he took the witness stand. Immediately upon that fact becoming evident, it was his duty to then determine whether or not he would be a witness in the cause, and if he was to testify, he should at that time have entirely severed his connection from the litigation. If the conclusion was that he should not testify, he and his client should have abided by that decision, unless some emergency thereafter arose which could not be anticipated, making it important for the protection of his client's interest that he should testify. Onstott v. Edel, 232 Ill. 201, 83 N.E. 806, 13 Ann.Cas. 28. This practice has been repeatedly condemned by this court. The testimony of an attorney in a case under such circumstances is entitled to little or no weight or credit'.

"Accord; Inman v. Inman, 158 Va. 597, 164 S.E. 383; Protheroe v. Davies, 149 Kan. 720, 89 P.2d 890; Béninca v. Nardiello, 320 Ill. 181, 150 N.E. 661, and Zeidler v. State, 189 Wis. 44, 206 N.W. 872."

The majority opinion places great reliance upon the credibility of the testimony of a neighbor, John Gillespy, pertaining to a business transaction. Gillespy testified he had a business transaction with testator in the year 1950, and on cross examination stated that he concluded this transaction with Meadors, the testator, on July 5, 1950. The undisputed hospital records of St. Anthony Hospital show that on July 5, 1950, Meadors was hospitalized, was suffering from arteriosclerosis, cerebral type, and that he did not even then know he had any daughters and that he did not know where he was, what day it was or what year it was. Certainly the credibility of a neighbor who testified that he concluded a business transaction with testator on July 5, 1950, when testator was in the hospital in such mental condition could not be said to rise to the dignity of testimony that is worthy of belief by any court.

The present majority say that the testimony of certain of 'contestants' witnesses (relatives by blood and marriage) who were in a position to know the mental condition of testator in 1950 established nothing more than old age, lack of neatness, bladder trouble, grief over the death of his wife and occasional forgetfulness. Testator's daughters testified positively as to his incompetency; Manila Ligon, a niece of testator's deceased wife, testified that in May, 1950, Meadors told her that he had to quit

going out to the cemetery because "I just expected Sadie (his deceased wife) to come and get in the car and she never would get in the car, and I wanted her to come home with me". Jack Ligon testified in the spring of 1950 testator would not recognize him, although he had been a frequent companion of testator. It is impossible to read and digest even the printed record of evidence in this case and conclude that there is not a great abundance of evidence establishing lack of testamentary capacity, and under the decisions of this court to the effect that the trial judge determines the truth and veracity of conflicting evidence, it is impossible to write a logical opinion upon all of the evidence in the record and conclude that the judgment of the trial court is against the clear weight thereof.

The majority opinion sets forth a written hospital record diagnosis of Dr. Walker Morledge dated July 8, 1950, wherein Dr. Morledge diagnosed testator's condition as very senile, and suffering from arteriosclerosis—cerebral type. Morledge did attempt to void this highly important and credible documentary evidence by saying he later changed his opinion. But the District Judge, who saw the witness and heard his testimony, did not believe the feeble attempt of Morledge to change his opinion. Certainly the trial judge was in the best position to ascertain the credibility of the testimony of Morledge, particularly when Morledge on cross examination admitted that the only manner in which Morledge could testify as to the condition of testator was from the written record made by him. Morledge testified as follows:

"Q. Now, as a matter of fact, Doctor, the only thing you know about C. F. Meadors, anyways near the time he made this will, was that diagnosis that has been called to your attention in St. Anthony's Hospital? Isn't that right? A. That is, as far as I remember.

"Q. That's all you know about it? A. (No reply).

"Q. And, as a matter of fact, you testified last spring, on March 17, 1953,

you testified that you didn't know a thing about him prior to 1950; *and now the only thing you know about him is in that hospital record. Isn't that right?* A. Yes, sir."

The District Judge in his decision said, in part:

"And then the record Doctor Morledge made. I am inclined to agree with Mr. Johns. You know, when a doctor has got his hand on a patient's heart, feeling his brow, looking at him, that is when he is more likely to make a record that speaks the truth. * * *"

Dr. John Roddy testified that testator was suffering from hardening of the arteries or arteriosclerosis prior to May, 1950. He also testified that Meadors was in the same mental condition in May, 1950, as when he saw him around the first of July when Meadors was in St. Anthony Hospital. The evidence is uncontradicted that Meadors did not have testamentary capacity in July, 1950. Dr. Basil Hayes testified he did not know the mental condition of Meadors in May, 1950. But on July 10, 1950, Dr. Hayes made a hospital record concerning testator in St. Anthony Hospital, as follows:

"7-10-50, Order, Dr. Hayes, Place sideboards on bed."

Every medical fact established herein corroborates the medical diagnosis of Dr. Morledge on July 8, 1950. It follows that when a progressive disease of the mind is once proven (as in this case arteriosclerosis —cerebral type), it is then established conclusively that such infirmity has existed for a considerable period of time prior thereto. See Bever v. Spangler, 93 Iowa 576, 61 N.W. 1072, 1078.

The question here presented is not whether the printed record of certain testimony of certain witnesses appears persuasive but whether all the evidence shows clearly and unmistakably that the judgment of the District Judge is contrary to the great weight thereof. If the evidence is conflicting, presenting evidence upon which the District Judge could believe either side, it is the duty of this Court to affirm the decision of the

District Judge. In Skirvin v. Skirvin, 177 Okl. 480, 60 P.2d 765, 768, this Court said:

"Upon reflection it must be concluded that the trial judge is in a better position to determine which of the witnesses has spoken the truth. The trial judge sees the witness and observes his demeanor and manner of answering questions upon direct and cross examination. It is difficult, approaching the impossible, to read the written report of conflicting oral testimony and say that this is false while that is true."

But, in addition to the impelling reasons above given, the record of this Court in this case speaks convincingly that the judgment of the District Court is not against the clear weight of the evidence. This cause was fully briefed, and argued orally to this Court of September 21, 1954. On November 16, 1954, an opinion was promulgated by this Court affirming the judgment of the trial court. Thereafter, a petition for rehearing was filed with briefs. A response was called for on November 30, 1954. On December 10, 1954, a response and brief in support thereof was filed. After full consideration the petition for rehearing was denied on June 7, 1955. On the same day, June 7, 1955, a Justice of the Court originally dissented to the opinion of November 16, 1954, changed his vote from dissent to concur, thereby adopting as his views those expressed in the original opinion of November 16, 1954, affirming the decision of the Trial Judge holding the identical decision in this case was not clearly against the weight of the evidence. Now the author of the opinion of this Court, as presently constituted, holding directly the converse of his vote and decision of June 7, 1955. How can it be said the decision of the Trial Judge is clearly against the weight of the evidence when the author of the present opinion originally decided the case one way, then a few months later changed his decision and now, upon second petition for rehearing, changes his decision again? Certainly, if the conflicting evidence in the printed record would cause the author of the present opinion to decide the case both ways, it cannot be said logically, that the decision of the trial judge in this case is against and contrary to the clear weight of the evidence.

In that circumstance alone there is a demonstration that this is a difficult case on the facts, or a very close case on the facts, or in other words, that it is very difficult, just from reading and re-reading the record, to tell where the preponderance or the weight of the evidence is. That definitely demonstrates that seeing and hearing the witnesses must have been impressive to the trial court. Here is certain demonstration that whichever way the trial court had found, could not be said to be *clearly* against the weight of the evidence.

Mr. Meadors was divorced from his first wife, the mother of his two daughters, many years ago, and within a few years he married another woman whom he lived with for some 52 years, until she died in 1949. There were no children born of the second marriage. It appears from the record that he was a man of exceptional ability. He knew, after he was divorced from his first wife, and before he married again, if he died without making a will all of his property would go to his two daughters, and after his second marriage he knew if he died without making a will, one-third of his property would go to his wife, and the other two-thirds to his two daughters. Then when his second wife died in 1949, at a time when he was competent to make a will, he knew if he died without making a will all his property would go to his daughters. This situation continued from 1949 to May 5th, 1950, at a time when he was in very bad health as reflected by the direct testimony of witnesses who testified in the case to the effect that he was not competent to make a will on that date. The trial judge held that no valid will was ever executed. I cannot agree under the facts and circumstances in this case, that the judgment of the trial court is against the clear weight of the evidence.

I therefore respectfully dissent.